COMMERCIAL UNION ASSUR. CO., Ltd., v. WINSTEAD. (No. 476.)

(Court of Civil Appeals of Texas. Beaumont. June 9, 1919.)

INSURANCE ⬅81 — TORNADO INSURANCE — PERPETRATION OF FRAUD BY OWNER AS AGENT.

Where the agent and employé of insurance agents issued a policy of the principal, assurance company, on his own property in the face of an approaching tornado without the knowledge and consent of the insurance company and without the knowledge and consent of his principal, agents of such insurance company, he perpetrated a legal fraud against the defendant insurer and cannot recover his loss.

Error from Harris County Court; Murray B. Jones, Judge.

Suit by E. M. Winstead against the Commercial Union Assurance Company, Limited.

Judgment for plaintiff, and defendant brings error. Reversed and rendered.

Locke & Locke, of Dallas, for plaintiff in error.

Kottwitz & Vance, of Houston, for defendant in error.

WALKER, J. This suit was brought by E. M. Winstead against the Commercial Union Assurance Company, Limited, to recover $166.20 as damages sustained to his residence in Houston, Tex., in the great storm of August 16 and 17, 1915, under a tornado policy. The defendant denied under oath the execution of the policy and the authority of the signer of the same. The case was submitted to the jury on special issues, and on their verdict judgment was rendered in favor of the plaintiff for $166.20, with 6 per cent. interest from January 11, 1917, and costs of suit.

The plaintiff, E. M. Winstead, was office manager for the insurance firm of Rice & Belk in the city of Houston on the 15th, 16th, and 17th of August, 1915, and had been such office manager for several years prior thereto. His property had been insured in the defendant company, but this insurance had lapsed in March, 1915. Without consulting Rice & Belk, who were the local agents in Houston for the defendant company, and without consulting the company, on the afternoon of August 16, 1915, the plaintiff wrote to the company a letter advising them that a policy for $2,000 would be issued to the plaintiff. In the record this letter is spoken of as a binder.

The following agreement of counsel and official report of the local forecaster at Galveston to the United States Weather Bureau concerning the storm give a full statement of the storm conditions when this policy was issued:

"It is agreed by and between the plaintiff and defendant herein that the Houston Post, the Houston Chronicle and the Houston Press, newspapers published in Houston, Harris county, Tex., did on August 16, 1915, carry as news items, notices from the United States Weather Bureau, advising that a storm or hurricane of unusual violence was in the Gulf of Mexico, and likely to strike the district in which Houston, Tex., is situated. That special editions of the Houston Chronicle of date August 16, 1915, recited as news items that the storm or hurricane was gradually approaching the district in which Houston, Tex., is located, and that residents of the city of Galveston in unusual numbers were leaving Galveston for the interior, and that in all probability the city of Houston would be struck by a storm or hurricane of unusual violence some time during the afternoon or night of August 16th and the morning of August 17, 1915."

The official weather report mentioned above was as follows:

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"This office first heard of the storm at 3:00 p. m., August 10th, when an advisory message was received from Washington to the effect that a tropical disturbance was apparently central near the Island of Dominica, moving west-northwest. From that time until the storm reached the Texas coast on the 16th, messages were received daily giving the approximate location and direction of travel. All of these warnings were given the widest possible dissemination and all interests were kept fully advised. During the afternoon of August 15th, it became evident from the appearance of the sea and sky that the storm was approaching, and at 4:00 p. m. northeast storm warnings were ordered up from Port Lavaca to Sabine by the official in charge at Galveston. At 5:53 p. m. the 15th, orders were received to hoist hurricane warnings. The mayor of the city was at once communicated with, assistance of the police and fire departments enlisted, and the headquarters of the U. S. army at Fort Crockett and Texas City were notified. These various agencies, together with the heads of several railway and steamship lines, co-operating, the warning was given a most thorough and far-reaching distribution, most of it about 18 hours in advance of any dangerously high winds or tides. A feature worthy of note is the willingness and energy displayed by the public in assisting to disseminate this warning. Mounted and motorcycle messengers, many of them from the army camps, carried the news to exposed localities. The Santa Fé Railway ran a special train to remove the people from small coast stations along their Beaumont division. The Galveston-Houston interurban ran trains all night the 15th–16th and several hundred people left the island. The telephone distribution of warnings was most extensive. From the time the hurricane warning was received, the 15th, until some time after noon the 17th, information was being given by telephone all the time, except about an hour and a half when the storm was at its worst and the roar of the wind prevented anything else being heard. That the warnings were generally heeded is evidenced by the fact that while, within the area protected by the sea wall, about two hundred dwellings were wrecked, only 11 deaths have been reported. The most conservative men of the community say that to the warnings of the weather bureau is due the comparatively small loss of life. Clippings from the press covering this feature have been forwarded.

"*Sky.*—The first signs of the approach of the hurricane were observed on August 15th, 1915. A bank of upper clouds appeared in the southeast in the early morning and during the forenoon it slowly approached. * * * There was a solar halo at 12:10 p. m. There was a yellow or copper colored hue, not only to the sky, but to everything, persisting practically all day. * * * There were cirrus clouds over the southeastern half of the sky throughout the afternoon. * * * At 3:30 p. m. there was a bank of darker clouds near the southeastern horizon. * * * At 5:00 p. m. the cirrus clouds extended nearly to the zenith. * * * At 6:00 p. m. the cirrus veil had overspread the entire sky, and a heavy bank of stratus or alto stratus was centered a little east of southeast, nearly the horizon.

"*Wind.*—The wind began coming in recogniza-ble characteristic puffs in the forenoon of the 15th. At first these puffs were light—a distinct miniature squall, being followed by almost a dead calm. These squalls never did increase very much in frequency, but their intensity increased, at first slowly, but later more rapidly until they became the furious gusts of the hurricane. On the 15th, the wind at 8 a. m. was 7 miles from the north. At noon it had increased to 13 miles northeast, and at 8 p. m. it was 20 miles northeast. At midnight it was still 20 miles, but had backed to the north. From this time on, midnight of the 15th–16th, the wind continued to increase. At about 1:45 a. m. the 16th, it veered to north-northeast, it had increased to 13 miles northeast and 8 p. m. it was 9:30 a. m., 45 at 11:20 a. m., 50 at 12:35 p. m., 55 at 1:17 p. m., 60 at 3:05 p. m., 65 at 3:50 p. m., 70 at 6:42 p. m., and continued to blow 70 miles or over until 4 a. m. the 17th."

Among the questions asked of the plaintiff and the answers given by him were the following:

"Q. Did you think there was a storm and it was going to hit your property some time during the night of August 16th or during the day of August 17th? A. I got cold feet like 10,000 other people in Houston got."

"Q. And you had this binder issued to yourself after you thought the damage was almost certain? A. I wanted to protect myself if anything should happen, like other people did."

A portion of plaintiff in error's second assignment is as follows:

"The judgment entered in favor of the plaintiff should not be permitted to stand, but should be set aside; for that under the pleadings and the undisputed evidence the plaintiff is not entitled to recover, since the undisputed evidence shows: (1) That the policy in suit was issued after the occurrence of the loss indemnity for which recovery is sought, in pursuance of a binder issued when such loss was imminent; and (2) that both said policy and said binder were issued by the plaintiff himself or under his immediate and sole direction acting in his capacity as agent for the defendant, and in favor of himself as beneficiary of the insurance, without the knowledge or consent of the defendant or of any agent of the defendant having authority to give such consent, at a time when the loss to be insured against was imminent, and understood by the plaintiff to be so."

Under the statement we have made of this case, it must have been clear to all the citizens of Houston that a destructive tornado was approaching the city. The plaintiff himself was fully advised of its approach, and of its probable consequences. He himself testified:

"I got cold feet like 10,000 other people in Houston got. I wanted to protect myself if anything should happen like other people did."

On this record, this assignment must be sustained. As a general legal proposition, it is implied in every agency contract that

the agent shall not bind his principal in favor of· himself.

"An agent cannot avail himself of his agency to do for his own benefit that which injures or affects his principal." Borden v. Houston, 2 Tex. 594.

"Such an agent (of an insurance company) may not, directly or indirectly, without the full knowledge and consent of his principal, issue policies to himself, or insure his own property. If he does so, his principal may repudiate the act." Mechem on Agency (2d Ed.) § 1204.

"An insurance agent cannot issue a policy to himself as receiver without the insurer's consent, such policy so issued being null and void." Joyce on Insurance (2d Ed.) vol. 4, § 2574.

In the note to Citizens' State ˙Bank of Chatauqua et al. v. Shawnee Fire Insurance Co., 49 L. R. A. (N. S.) p. 972, the late cases on this subject are fully reviewed. Also in Arispe Mercantile Co. v. Capital Insurance Co. of Des Moines, 133 Iowa, 272, 110 N. W. 593, 9 L. R. A. (N. S.) 1084, 12 Ann. Cas. 93, the older cases are reviewed. These cases fully sustain the rule as announced in Mechem, supra, and in Joyce on Insurance, supra.

See, also, Story, Agency, §§ 9, 10; Huffcutt, Agency, § 90; 1 Mechem, Agency, § 1189 et seq.; Borden v. Houston, 2 Tex. 594; Shannon v. Marmaduke, 14 Tex. 217; Flanikin v. Fokes, 15 Tex. 180; McMahan v. Alexander, 38 Tex. 136; Armstrong v. O'Brien, 83 Tex. 635, 19 S. W. 268; Texas Brokerage Co. v. John Barkley & Co., 60 Tex. Civ. App. 466, 128 S. W. 431; Henyan v. Trevino, 137 S. W. 458; Labrie v. Cartwright, 55 Tex. Civ. App. 144, 118 S. W. 785; Amarillo National Bank v. Harrell, 159 S. W. 858; Moore v. Kelley, 162 S. W. 1034; Bentley v. Columbia Insurance Co., 19 Barb. (N. Y.) 595; s. c., 17 N. Y. 421; Zimmermann v. Dwelling House Ins. Co., 110 Mich. 399, 68 N. W. 215, 33 L. R. A. 698; Fireman's Fund Ins. Co. v. McGreevy, 118 Fed. 415, 55 C. C. A. 543; Spare v. Home Mutual Ins. Co. (C. C.) 19 Fed. 14; Greenwood Ice & Coal Co. v. Georgia Home Ins. Co., 72 Miss. 46, 17 South. 83; Wildberger v. Hartford Fire Ins. Co., 72 Miss. 338, 17 South. 282, 28 L. R. A. 220, 48 Am. St. Rep. 558; Glen Falls Ins. Co. v. Hopkins, 16 Ill. App. 220; Ritt v. Washington Marine & Fire Ins. Co., 41 Barb. (N. Y.) 353; 1 Mechem, Agency, §§ 1207, 1353; 2 Corpus Juris, 714; Bower, Actionable Nondisclosure, § 335 et seq.; Hall v. Gambrill (C. C.) 88 Fed. ·709; Hall v. Gambrill, 92 Fed. 32, 34 C. C. A. 190; Proudfoot v. Wightman, 78 Ill. 553; Hegenmyer v. Marks, 37 Minn. 6; 32 N. W. 785, 5 Am. St. Rep. 808; Smitz v. Leopold, 51 Minn. 455, 53 N. W. 719; Holmes v. Cathcart, 88 Minn. 213, 92 N. W. 956, 60 L. R. A. 734, 97 Am. St. Rep, 513; Snell v. Goodlander, 90 Minn. 533, 97 N. W. 421; Leonard v. Omstead, 141 Iowa,

485, 119 N. ˙W, 973; Jansen v. Williams, 36 Neb. 869, 55 N. W. 279, 20 L. R. A. 207; Bentley v.· Nasmith, 1912, 46 Can. S. C., 477, 3 D. L. R. 619; Machar v. Vandewater, 1878, 26 Gr. Ch. 83; Newstead v. Rowe, 1910, 3 Sask. 176; Devall v. Burbridge (Pa.) 4 Watts & S. 305; Moore v. Thompson (Pa.) 9 Phila. 164; Clark & Co. v. Bank of Wheeling, 17 Pa. 322; Prince v. Du Puy, 163 Ill. 417, 45 N. E. 298; Carpenter v. Fisher, 175 Mass. 9, 55 N. E. 479; Warren v. Burt, 58 Fed. 101, 7 C. C. A. 105; Calmon v. Sarraille, 142 Cal. 638, 76 Pac. 486; Dorr v. Camden, 55 W. Va. 226, 46 S. E. 1015, 65 L. R. A. 348; 1 Mechem, Agency, §§ 1207, 1353; 2 Corpus Juris, 714; Bower, Actionable Nondisclosure, § 335 et seq.

In issuing a policy on his property in the face of an approaching tornado without the knowledge and consent of the insurance company, and without the knowledge and consent of his principal, Rice & Belk, the plaintiff perpetrated a legal fraud against this defendant, and cannot recover on this loss.

This cause is reversed and rendered in favor of plaintiff in error.

───────────────
⬤⟰For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes