JUDD v. LUBBOCK MUTUAL AID ASS'N NO. 2 et al. (No. 2430.)

(Court of Civil Appeals of Texas. Amarillo. Feb. 18, 1925.)

1. Insurance ⊙⟶380—Agent's knowledge of insured's bad health held not imputable to insurers.

Agent's knowledge of insured's bad health *held* not imputable to insurers, against whom he perpetrated legal fraud in filling out and signing application.

2. Insurance ⊙⟶265, 380—Representations as to health held warranty; insurers not bound by certificate issued on application containing false statement as to insured's health.

Insured's representations as to his health constitute warranty, and, where false, as he, the beneficiary, and insurer's agent, who filled out and signed application, knew, insurers were not bound by certificate.

Appeal from District Court, Lubbock County; Clark M. Mullican, Judge.

Action by Lucy Judd against the Lubbock Mutual Aid Association No. 2 and another. Judgment for defendants, and plaintiff appeals. Affirmed.

Robert H. Bean, Jack M. Randal, and Bean & Klett, all of Lubbock, for appellant.

Vickers & Campbell, of Lubbock, for appellees.

RANDOLPH, J. Mrs. Judd filed this suit against the Lubbock Mutual Aid Association No. 2, an unincorporated association, and against Elmo Wall, to recover on a certificate of insurance issued by the association on the life of her husband, N. B. Judd, deceased, for $1,000, alleging that the policy provided for payment to her, in case of death of said N. B. Judd, of $1 for each member in good standing, and alleging that there were 1,000 such members of said association, and that said N. B. Judd was in good standing at the time of his death. She also sought to hold Elmo Wall personally liable, because at that time he was conducting a business which he called the Lubbock Mutual Aid Association No. 2, and in the conduct of said business sought members and collected fees from them, and therefrom paid death benefits.

Appellees answered, specially pleading that N. B. Judd was not in good health when he made the application for insurance and when the certificate was issued to him, and that they did not know of such bad health of N. B. Judd at the time such application was made and such certificate issued.

Appellant, by supplemental petition, replied to this allegation that she had made no representations as to N. B. Judd's health, and had not authorized any one to make same; that the insured had made no such representation, and did not sign the application for insurance; that the application was made out by A. Judd, the agent of defendants Wall and the association; that, if N. B. Judd was not in good health, it was known to A. Judd, the agent of defendants; that defendants did not issue the policy by reason of any representations that insured was in good health; and that by reason of the foregoing, the defendants were estopped to rely upon the bad health of N. B. Judd.

The case was submitted to the jury upon special issues, and the jury found: First, that A. Judd was the agent of Elmo Wall or of the association; second, that Elmo Wall, at the time the application was made, could by the exercise of ordinary diligence have ascertained that N. B. Judd was in bad health; and, third, that the Lubbock Mutual Aid Association No. 2, at the time the application was made, had no notice that Judd was in bad health, and upon these findings the court entered judgment that plaintiff take nothing by her suit. From this judgment appeal has been taken to this court.

The errors presented by appellant's propositions are: (1) The jury having found that A. Judd was the agent of the defendants, and the evidence being conclusive that A. Judd filled out the application for insurance, and that he knew that Judd was not in good health; (2) as neither the beneficiary nor insured made any misrepresentation and as the misrepresentations, if any, were made by the agent of the defendants, the defendants were not deceived, and did not rely on said misstatements; (3) the court erred in render-

ing judgment for defendants and against plaintiff, because the findings of the jury are conflicting on a material issue, and a mistrial should have been declared.

The evidence shows that N. B. Judd was in bad health at the time the application for insurance was signed; that his cousin, A. Judd, signed the application for him; that Elmo Wall and the association had no actual knowledge of the bad health of N. B. Judd at the time said application for insurance was made; that A. Judd was paid a small part of the first premium fees by Elmo Wall. The application was dated October 10, 1922. In this application the questions, "Have you been treated by a physician in the last 12 months? And for what cause?" were not answered; but the question, "Are you now in good health?" was answered, "Yes." It appears from the testimony of Dr. Wagner, which is not denied, that he made an examination of N. B. Judd on October 6, 1922, 4 days before the date of the application, and that Judd was in an advanced stage of pulmonary tuberculosis, and that he, the doctor, so informed the said Judd. It appears that Mrs. Judd, N. B. Judd, and A. Judd had some conversation about taking out insurance. Mrs. Judd testifies that she talked to Mr. A. Judd about it in his store, and that A. Judd promised to go to Elmo Wall of the Lubbock Mutual Aid Association No. 2 and see about it, and afterwards A. Judd "told her he had." She did not know how much the policy would be, and did not say anything to A. Judd about paying the premium—he said he had attended to it for her. She knew that her husband was in bad health. N. B. Judd died December 2, 1922, something over six weeks after the making of the application.

Elmo Wall, testifying relative to the facts surrounding the making of the application, gives this as his version of it:

"I run a number of these associations, and attend to signing them up. I didn't send Mr. Judd a copy of my by-laws; these by-laws were printed prior to the issuance of this policy, I furnish them to my agents. I have several agents, but Mr. A. Judd wasn't one of them. In a way I allowed him a commission; we do some times. A party will say, 'I can get somebody to join, would you allow me something if I get you a member?' and he says, 'I got you four members,, will you allow me something?' and I told him I would. I allowed him something that time, but didn't a good many times. If he ever wrote anybody except these other two relatives, I don't know anything about it. We frequently allow a $1 commission when somebody brings us a member. We don't require that our applicants be examined, the state law don't require it. We don't take one who we have reason to doubt being in good health, not if we know it. * * * "A. Judd asked for insurance for N. B. Judd and his wife October 23, 1922, and I remember the occasion. He said he had some relatives needed some insurance (this conversation occurred some time before the date the application was made), and that at some later time he was going to take out some insurance for them, they were poor people, and were unable to pay for it, and he was going to do it for them, and later on the 23d of October I met him here at the foot of the stairs in the Johnson building where I officed at the time, and he appeared to have just come down, and he said, 'I came over here to talk about that insurance,' so we went up the stairs, and that's when the applications were filled out. I suppose I asked him all the questions in this regular printed blank; asked him about his physician. He didn't tell me anything, said he was in good health, I don't remember the words, anyway he was in good health, that's on there. I suppose he told me he had no physician—I asked him all the questions on there—and evidently he didn't tell me of his having been treated by a physician, because he didn't have a physician on there.

"After this application was made, I saw an item in the Avalanche that A. Judd had taken N. B. Judd, who had been sick for some time, to San Angelo on account of his health, evidently the latter part of November. I saw A. Judd in about a week or so after that, evidently the day the man died; anyway it was on Saturday. I saw him in my office. He came up there to pay for some policies of membership, fees of his son or son-in-law. As he came in the office there was a person in the office, so I just went with him in the back room and says, 'Mr. Judd, I see in the paper that your relative is sick, and you understand we don't write sick people,' and he says, 'Yes, I understand, I know you don't write sick people, but he is not sick, he has got something the matter with his liver,' and I said, 'I got the impression from the paper report maybe he had T. B.,' and he says, 'No, he never had T. B.,' never was a Judd had T. B. that he knew anything about. That was on Saturday, and Monday evening I saw him again. He came in and told me Mr. Judd had died, and I said, 'Died!' and he said, 'Yes, he died of heart failure,' and he wanted to collect the policy. I made inquiries as to his condition, and found he had T. B. Dr. Wagner told me what his trouble was, and I refused to O. K. the claim. Mr. Judd then requested that I call a meeting of some of my directors and let him state the matter to them, so I called a meeting, and he met with us, and made his statement that he believed this claim ought to be paid in this instance on account of the needs of the family; and I told the board that this was not in any respect a charitable organization but an insurance business, and we did not write people who were sick, and they upheld me in refusing payment. I didn't know Mr. Judd had been treated by a physician when this policy was issued; hadn't been advised of that fact. We don't insure people who are not in good health."

The constitution of defendant association states the objects of the association to be:

"To unite all respectable white persons, male and female, in a state of good health, between the ages of 15 and 55 years, inclusive, in a mutual life insurance association."

The certificate of membership in the association states that it is issued subject to

the constitution and by-laws of the association, and that the membership of N. B. Judd is based upon his application, and said application is made a part of the contract of insurance as well as the certificate.

[1] There is no question but that N. B. Judd was aware of his physical condition. He had been under treatment of two physicians; one of whom testified that he informed said Judd of his condition. The wife of Judd also knew he was in bad health, and his cousin, who filled out and signed the application for him, knew it, and we are not inclined to hold, under the circumstances, that the jury's finding that A. Judd was the agent of defendants, which finding is evidently based upon the receipt by A. Judd of a few dollars premium, necessarily settles the question of agency as a matter of law, but, if A. Judd was the agent of defendants, his knowledge of the bad health of N. B. Judd cannot be imputed to defendants. He was acting against the interest of Wall and the association, and perpetrated legal fraud upon them in favor of his kinsmen. In the case of Ryan v. World Life Insurance Co., 41 Conn. 168, 19 Am. Rep. 490, which is quoted from with approval by Judge Rice in the case of Sovereign Camp Woodmen of the World v. Lillard (Tex. Civ. App.) 174 S. W. 622 (writ denied), the court says:

"In this case we are asked to go further than any case has yet gone, and clothe the agent with an authority not given him in fact, and to hold the principal responsible for an act which could not by any possibility have been contemplated as being within the scope of the agency. In most, if not in all, of the cases in which the act of the agent has been regarded as the act of the principal the act has been the natural and probable result of the relations existing between the parties, or so connected with other acts expressly authorized as to afford a reasonable presumption that the principal intended to authorize it. But it cannot be supposed that these defendants intended to clothe this agent with authority to perpetrate a fraud upon themselves. That he deliberately intended to defraud them is manifest. He well knew that, if correct answers were given, no-policy would issue. Prompted by some motive, he sought to obtain a policy by means of false answers. His duty required him not only to write the answers truly as given by the applicant, but also to communicate to his principal any other fact material to the risk which might come to his knowledge from any other source. His conduct in this case was a gross violation of duty, in fraud of his principal, and in the interest of the other party. To hold the principal responsible for his acts, and assist in the consummation of the fraud, would be monstrous injustice. When an agent is apparently acting for his principal, but is really acting for himself, or third persons, and against his principal, there is no agency in respect to that transaction, at least as between the agent himself or the person for whom he is really acting and the principal."

The court further says:

"In the second place, if the rule is to be applied to this case, it is by no means certain that it will aid the plaintiff. The fraud could not be perpetrated by the agent alone. The aid of the plaintiff or the insured, either as an accomplice or as an instrument, was essential. If she was an accomplice, then she participated in the fraud, and the case falls within the principle of Lewis v. Phœnix Mut. Life Ins. Co., 39 Conn. 100. If she was an instrument, she was so because of her own negligence, and that is equally a bar to her right to recover. She says that she and her husband signed the application without reading it and without its being read to them. That of itself was inexcusable negligence. The application contained her agreements and representations in an important contract. When she signed it, she was bound to know what she signed. The law requires that the insured shall not only, in good faith, answer all the interrogatories correctly, but shall use reasonable diligence to see that the answers are correctly written. It is for his interest to do so, and the insurer has a right to presume that he will do it. He has it in his power to prevent this species of fraud, and the insurer has not."

[2] In this case, not only did the insured know his condition, and that he was in bad health, but so did the beneficiary, and so did A. Judd, his kinsman.

The representations as to the health of the insured constituted a warranty of the truth of the statement, and, in view of the falsity of the statement that he was in good health, the association is not bound by the certificate issued. Wright v. Federal Life Ins. Co. (Tex. Com. App.) 248 S. W. 327, 328 and authorities therein cited; Hemphill County Home Protective Association v. Richardson (Tex. Civ. App.) 264 S. W. 294.

We therefore overrule all assignments of error and propositions of appellant, and affirm the judgment of the trial court.