INDEPENDENCE INSURANCE COM-
PANY, Appellant,

v.

REPUBLIC NATIONAL LIFE INSURANCE
COMPANY, Appellee.

No. 17312.

Court of Civil Appeals of Texas.

Dallas.

Oct. 24, 1969.

Rehearing Denied Nov. 21, 1969.

Philip Wilson, Brady, Drake & Wilson, Dallas, for appellant.

Robert Lee Guthrie, Johnson, Guthrie, Woodburn & Hunter, Thomas G. Nash, Jr., J. W. Dewbre, Dallas, for appellee.

CLAUDE WILLIAMS, Justice.

This action was instituted in the name of Independence Insurance Company (hereinafter called Independence) against Republic National Life Insurance Company (hereinafter called Republic) in which judgment was sought based upon an agreement of reinsurance. Independence alleged that it had entered into a treaty with Republic whereby Republic had agreed to become the reinsurer for Independence. Independence alleged that on April 27, 1965 it had issued a policy of life insurance covering the life of one Aubrey L. Graham for a face amount of $100,000, the beneficiary named in such policy being Twilight Acres, Inc. of Pampa, Texas, the employer of Graham. It was alleged that thereafter, Independence ceded under its reinsurance agreement to Republic reinsurance of such policy in the amount of $95,000, Independence retaining its maximum retention of $5,000 pursuant to the basic agreement. The annual premium for reinsurance upon such policy was paid by Independence to Republic. Thereafter, Graham died on August 27, 1965 and Independence paid to Twilight Acres, Inc. the amount of $100,000. Independence alleged that it made demand upon Republic to be reimbursed in the sum of $95,000 pursuant to the reinsurance contract but that Republic had failed to pay same and thereby repudiated and breached its agreement. Judgment was sought in the sum of $95,-000, together with penalty and attorney's fees.

Republic answered by asserting certain special defenses, the principal ones being: (1) that the policy of insurance issued to

Graham had lapsed for failure to pay premiums thereon, such lapse occurring on July 27, 1965 at a time prior to Graham's death so that there was no valid insurance coverage on the life of Graham and hence no liability upon the part of the reinsurance company; (2) that any act on the part of Independence in paying the face value of the policy of insurance was a voluntary act and not binding upon Republic; (3) that prior to the time Independence paid the amount of the policy Republic had notified Independence, both orally and in writing, not to pay such policy and that such payment was not therefore binding upon Republic; (4) that Independence was estopped by its own acts and conduct from contending that a valid policy existed at the time of the death of Graham and (5) that under pleaded facts and circumstances the payment of the amount of the policy to Twilight Acres, Inc. constituted fraud against Republic. Republic tendered into court for the benefit of Independence the sum of $120.31 representing the unearned premium on the policy in question.

Trial was had before the court and a jury and at the conclusion of the evidence both Independence and Republic filed motions for instructed verdict. The trial court sustained the motion of Republic and overruled that of Independence. Judgment was thereafter rendered in favor of Republic and against Independence denying it any recovery save and except the tendered unearned premium of $120.31.

In its first nine points of error appellant Independence contends that the trial court was in error in directing a verdict for appellee Republic because there were at least eight issues of fact which should have been submitted to the jury. By its tenth point of error appellant takes the position that there were no issues of fact and that it was entitled to judgment, as a matter of law. By its eleventh point of error appellant charges error in excluding certain testimony.

Being called upon to determine the propriety of the action of the trial court in directing a verdict for appellee we are mindful of the well established rule of law that it is error to instruct a verdict when there is any evidence of probative force to raise any material issue of fact. In determining the legality of the authority of the court to direct a verdict, as was done here, we must view the evidence most favorably in behalf of appellant. A trial court is only warranted in giving an instructed verdict when the evidence is such that no other verdict should be rendered. Huff v. Stafford, 429 S.W.2d 620 (Tex.Civ.App., Dallas 1968); Lane v. Cloninger, 444 S.W. 2d 199 (Tex.Civ.App., Amarillo 1969).

In the light of these rules, and in considering appellant's first ten points of error, it is essential that we summarize the material facts, much of which are documentary in form.

At all times material hereto Independence was a Texas corporation, authorized to issue policies of life insurance, having its principal place of business in Amarillo, Texas. Robert L. Hudson was president of Independence and owned 61,000 shares of its common stock. Mr. Hudson's wife, Jodie Hudson, was his secretary and also an officer of Independence. Mrs. Eugenia Castles was vice-president and secretary of Independence and also supervisor of the home office administration, working directly under Robert L. Hudson. C. J. Humphrey was vice-president and general counsel for Independence and also Hudson's personal attorney.

Twilight Acres, Inc. was a Texas corporation domiciled at Pampa, Texas and operating a convalescent home at that place. Robert L. Hudson ultimately became the owner of all of the stock of Twilight Acres, Inc. Aubrey L. Graham was an employee of Twilight Acres, Inc. Twilight Acres, Inc. became involved in financial difficulties and owed, among other indebtednesses, a $26,000 note to Panhandle Bank & Trust Company of Amarillo, Texas. Hudson was individually liable on this note.

In December 1964 Aubrey L. Graham signed a written application to Independence for $100,000 life insurance on his own life in which Twilight Acres, Inc., his employer, was named as sole beneficiary and premium payer. Pursuant to such application, Independence issued its Policy No. 3890, effective April 27, 1965, in the sum of $100,000 on the life of Graham in which Twilight Acres, Inc. was named as sole beneficiary. The policy contained a special monthly premium endorsement which provided, inter alia, that monthly installments of premiums could be paid by or through the medium of preauthorized checks executed by the company based upon written authorization made to the insured's bank. Pursuant to this endorsement Robert L. Hudson, acting as president of Twilight Acres, Inc., executed a written authority to Independence authorizing such company to draw checks upon Citizens Bank & Trust Company of Pampa, Texas to cover monthly installments of premiums due on the policy issued to Graham. This written authority contained the following statement:

"I have given authority to the above named bank to honor checks drawn by you on my account to pay insurance premiums due you or to become due you. It is understood that your sending of a preauthorized check to the bank as a premium or premiums become due shall constitute valid notice of such premium or premiums due. When the bank honors the preauthorized check by charging it to my account, such check shall constitute my receipt for the premium or premiums paid. Should any preauthorized check not be honored by said bank when received by them, then it is understood that the premium or premiums are to be paid to you in the amount and within the time stipulated for payment, and in default thereof the contract or contracts will become null and void except as otherwise provided therein. Money received from each preauthorized check shall be credited to the oldest outstanding item or items owed you on each con-

tract listed above as is hereinafter provided."

An identical authorization was signed by Hudson and given to Independence to cover preauthorized checks drawn on the account of Pampa Convalescent Center, Inc., in the Citizens Bank & Trust Company of Pampa, Texas. It is without dispute in this record that Pampa Convalescent Center, Inc. was not actually incorporated but was a name used by Robert L. Hudson in his operations.

After the policy was issued on April 27, 1965 it was delivered to Graham who, in turn, delivered it to Hudson who retained same in his possession until the time of Graham's death.

On April 27, 1965 Independence issued its preauthorized check in the sum of $167.62 to Citizens Bank & Trust Company of Pampa, Texas, to be charged to Twilight Acres, Inc. and Robert Hudson, and representing the initial premium on the policy. This check was returned in due course with the record "Account Closed" printed thereon. Thereafter Hudson executed a second preauthorized check in the name of Pampa Convalescent Center, Inc., dated May 28, 1965 in the sum of $167.62 and which contained the notation "Contract No. 3890—Date Due 4 27 65—1 mo." This check was paid by Citizens Bank & Trust Company of Pampa, Texas on May 28, 1965. Thereafter on June 4, 1965 a second check in the sum of $167.62 was drawn by Independence on the account of Pampa Convalescent Center, Inc., authorized by Robert L. Hudson, and contained the notation "Contract No. 3890—Date Due 5 27 65 —1 mo." This check was also paid. On June 27, 1965 a third preauthorized check in the sum of $167.62 was drawn by Independence on the same account of Hudson, with the notation that it was for the premium due June 27, 1965. This check was returned with the notation "Insufficient Funds". On July 19, 1965 a fourth check in the sum of $167.62 was drawn by Independence on the same account, as authorized by Hudson, with the notation that

it was for the premium due June 27, 1965. This check was also returned unpaid by the bank with the notation on the face thereof, "Insufficient Funds". Thereafter Independence made no further efforts to collect on Mr. Hudson's preauthorized checks. It is undisputed that the last money Independence received in payment of the monthly premiums on Policy No. 3890 was on June 6, 1965 and according to the face of the check this paid the monthly premium due May 27, 1965. Mrs. Castles, the vice-president of Independence, testified that on several occasions she called Mr. Hudson's attention to the fact that the preauthorized checks issued by him had been returned unpaid and that on the last occasion of such notification he advised her to "hold it" until he returned from a trip. The "hot checks" were never paid. The records of Independence reveal that the two premium payments were credited as shown on the checks themselves and that the policy was shown to have been terminated "8-1-65 (as of 7-28-65)". Mrs. Castles, who was in charge of keeping the records, testified that such entry on the books meant the grace period for the payment of premiums expired July 28, 1965. Graham was killed in an airplane crash on August 27, 1965.

It is undisputed that Twilight Acres, Inc. was in bad financial condition. It owed $280,000 in 1964 and prior to Graham's death the corporation had made an assignment for the benefit of creditors, such assignee being C. J. Humphrey who was vice-president and general counsel of Independence and also the personal attorney for Hudson.

Faced with obvious conflicting interests Hudson, acting on behalf of himself and as president of Independence, and also as president and sole owner of the insolvent Twilight Acres, Inc., accompanied by his attorney, C. J. Humphrey, who was also assignee for the benefit of creditors of Twilight Acres, Inc., conferred with the officials of Republic concerning the payment of the claim of Twilight Acres, Inc. under the policy. Shortly after this con-ference Hudson and Humphrey were advised, both orally and in writing, by the officials of Republic that the claim on the policy should not be paid without further consultations with Republic. In a letter dated September 20, 1965 addressed to Hudson as president of Independence, Republic stated:

"After a thorough review of the files and records which we obtained, we have determined that in our opinion the policy on the life of Aubrey L. Graham was lapsed in conformity with the policy provisions. In view of this it is our recommendation that you decline the claim made under this policy.

Our decision in this matter is based upon a number of things, including the company records, policy terms, and our legal research.

We realize the position that both you and Mr. Humphrey find yourselves in due to your connection with the Twilight Acres Corporation, which is the beneficiary. We appreciate the discussions which you had with us and especially your indication of your personal interest in the matter. Our opinion is not in any way intended to reflect upon your objective attitude but, as you no doubt realize, we must make an independent decision in this regard.

In view of the circumstances surrounding this claim and policy, we hereby give you formal written notice that Republic National will require that any settlement, payment, compromise or other disposal of the claim must be reviewed with the appropriate officers of this company before it will consider any such settlement, payment, compromise or disposal to be binding upon it under the terms of the reinsurance contract."

On September 30, 1965 at 7:30 P.M. a special meeting of the "Executive Committee" of Independence was held at Jim's Steak House in Pampa, Texas. Of the seven directors of Independence who attended this committee meeting at least three

were the controlling officers of Independence: Robert L. Hudson, President, C. J. Humphrey, Vice-President and General Counsel, and R. F. James MacDonald, Executive Vice-President. The minutes of this meeting reflect that Hudson, acknowledging his conflicting interests, yielded the chair of the meeting to his personal attorney, C. J. Humphrey, who presided and explained to the committee why he thought the claim on the policy should be paid. He explained that Twilight Acres, Inc. was in the hands of an assignee for creditors and that the assignee would press for the payment of the claim. Humphrey stated to the members present that Republic was resisting the payment of the claim, contending that the policy had lapsed. Humphrey recommended that payment be made and a vote was taken which resulted in a unanimous vote, including that of Humphrey, to pay the claim. The next day, October 1, 1965, a check in the sum of $100,000 was drawn and signed by Hudson as president of Independence payable to Twilight Acres, Inc. This was endorsed by C. J. Humphrey, Assignee for Creditors of Twilight Acres, Inc., and deposited to his account and used to pay the creditors of Twilight Acres, Inc. Five days later, Hudson notified Republic that the executive committee had ordered the claim paid and demanded that Republic reimburse Independence in the sum of $95,000 pursuant to the reinsurance contract.

During the trial Mr. Andress, one of the directors present at the executive meeting, testified that Humphrey had led him to believe that the "hot checks" given in payment of the premiums had been made good. Mr. Brittain, another director, testified that he was led to believe that the $100,000 would be paid to the estate of Al Graham.

On March 8, 1966 Twilight Acres, Inc. forfeited its charter and thirteen days later Independence Investment Corporation, a loan company whose principal stockholder was Robert L. Hudson, borrowed $95,000 from a bank and repaid Independence Insurance Company the $95,000 of the insurance proceeds paid to Twilight Acres, Inc. Independence Insurance Company thereupon assigned its interest in the claim to Independence Investment Corporation and authorized the loan company to prosecute this suit in the name of the insurance company, which was done. The directors of Independence Insurance Company, some of whom were also directors of the loan company, guaranteed the payment of the loan company's $95,000 note to the bank.

In the light of these uncontroverted facts we turn now to the resolution of the two principal questions presented: (1) Was there a valid and subsisting policy of insurance in force and effect on August 27, 1965 covering the life of Aubrey L. Graham and which had been reinsured by Republic? And (2) under the facts and circumstances presented were fraud and bad faith evidenced, as a matter of law, which would vitiate the voluntary payment made by Independence to Twilight Acres, Inc. of the principal amount of the policy?

The express terms and provisions of the reinsurance contract or treaty made the basis of this lawsuit provide in Article II, Section 6, the following:

> "The liability of the REPUBLIC NATIONAL shall begin simultaneously with that of the CEDING COMPANY and in no event shall the reinsurance of the REPUBLIC NATIONAL be in force and binding unless the policy issued by the CEDING COMPANY to the insured is in force."

■ This provision of the reinsurance contract merely states the prevailing law in such cases which is to the effect that the reinsurer under a contract of reinsurance in the strict sense of the term is liable only if the reinsured is liable. A contract of reinsurance does not enlarge the rights of the insured under the original policy or renew rights already lost. 44 Am.Jur.2d, Insurance, § 1862, p. 793, and cases therein cited. So, it is elementary, that if Independence was not legally bound under the terms and provisions of the original con-

tract of insurance issued by it to Aubrey L. Graham then, by the same token, Republic cannot be said to be liable.

 We are convinced, based upon a careful examination and study of all the evidence presented to the trial court, made in view of the rules of review announced above, that on August 27, 1965, the date of Aubrey L. Graham's death, the policy of insurance which had theretofore been issued covering his life on April 27, 1965, had lapsed for failure to pay premiums on said policy and was, therefore, not a valid contract of insurance which should have been paid.

The facts are relatively simple and uncontroverted. Graham applied for and received the policy from Independence. Independence, acting through its agents and officers, exercised its legal right to establish the effective date of said policy as April 27, 1965. The policy was physically delivered to Graham who immediately returned it to Mr. Hudson who was president and owner of Twilight Acres, Inc., the sole beneficiary. Hudson retained the policy. The policy contained express provision that:

"This policy is issued in consideration of the application, herefor, and the payment to be made in advance of the first payment as stated in the Schedule and the continued timely payments of premiums thereafter during the lifetime of the Insured, or until premiums have been paid for the full number of years stated in the Schedule."

Under the heading "Premium Payments" the policy provided that payment of any premium or installment thereof shall not maintain the policy in force beyond the due date when the next premium or installment is payable. Pursuant to the "Special Monthly Premium Endorsement" it was specifically provided that the privilege for special monthly premium payments by preauthorized checks shall be automatically discontinued and of no further force and effect upon the return by the bank of two such checks because of insufficient funds.

The preauthorized check agreements signed by Hudson expressly provide that money received from the preauthorized checks will be credited to the oldest items outstanding on the contract of insurance. Thus when the first preauthorized check issued by Hudson in payment of the first premium which was due on April 27, 1965 was returned by the bank unpaid a second preauthorized check was immediately issued and, upon its face, provided that it was to cover the premium due April 27, 1965. Independence credited this payment of the second preauthorized check to the oldest item due which was the premium due on April 27, 1965. The next check showed on its face that it was for the premium due May 27, 1965. It was paid and duly credited. These were the only two premiums actually paid. Two preauthorized checks were then issued and returned "Insufficient Funds" and no further payments were made thereafter. This makes it abundantly clear that only two monthly premium payments were paid. These payments were for the period of time from April 27, 1965 to June 27, 1965. The policy contained a 31-day grace period which would extend the policy life to July 28, 1965. The policy lapsed on this date and such fact is evidenced by the records of Independence wherein it is stated that the policy was terminated "8–1–65 (as of 7–28–65)".

The policy having lapsed for failure to pay premiums on July 28, 1965, it was not in force and effect on August 27, 1965, the date of Graham's death. There being no policy in force and effect on August 27, 1965, there was no legal liability or responsibility on the part of Independence to pay the face amount of such policy. By the same token, there was no liability on the part of Republic, as reinsurer, to pay anything under its contract of reinsurance.

Appellant's contention that there were a number of issues of fact which should have gone to the jury is without merit.

Each of the alleged issues is either undisputed in the record or amounts to a question of law and not of fact.

 In addition to our finding that, as a matter of law, no valid policy of insurance existed on August 27, 1965, and therefore no liability on either Independence or Republic based upon the policy in question, we think that the trial court was also justified in instructing a verdict in view of the uncontroverted evidence on the issue of fraud and bad faith relative to the payment of the claim by Independence.

Article XVII, Section 2, of the reinsurance treaty between Independence and Republic provides that:

"Whenever a claim is made under a policy of the CEDING COMPANY which has been reinsured hereunder, whether the claim is under the strict policy conditions or under a compromise or otherwise, the settlement made by the CEDING COMPANY shall be unconditionally binding on the REPUBLIC NATIONAL, * * *."

It is generally held that by such type of stipulation the reinsurer submits itself to any settlement or adjustment of liability on the original policy which reinsured may adopt or assume in good faith. Royal Ins. Co. of Liverpool, England v. Caledonian Ins. Co. of Edinburgh, Scotland, 182 Cal. 219, 187 P. 748 (1920). However, it is also settled that a provision of a reinsurance contract authorizing reinsured to settle or adjust a claim of the original insured does not authorize the reinsured to impose liability on the reinsurer by settlement or adjustment of a claim for which no liability exists, as a matter of law. The reinsurer may attack a settlement for fraud or collusion. 46 C.J.S. Insurance § 1231, p. 216, and cases therein cited. Cases involving construction of such provisions in a reinsurance treaty recognize that a reinsurer is not bound by any settlement made by the ceding company if the ceding company acts in fraud, bad faith or collusion. Royal Ins. Co. v. Caledonian Ins. Co., 182 Cal.

219, 187 P. 748 (1920); Insurance Co. of New York v. Associated Mfgrs. Mut. Fire Ins. Corp., 70 App.Div. 69, 74 N.Y.S. 1038, affirmed 174 N.Y. 541, 66 N.E. 1110 (1902); New York State Marine Ins. Co. v. Protection Ins. Co., 18 Fed.Cas. p. 160, No. 10,216 (1841).

As we have held, there was no valid policy of insurance in existence at the time the so-called settlement of the claim was made by Independence. The testimony is uncontroverted that both Hudson and Humphrey were acting in a dual capacity and were faced with conflicting interests at the time the recommendation was made to the executive committee of Independence to pay the claim to Twilight Acres, Inc. Hudson, as president of Independence and owner of Twilight Acres, Inc. and Humphrey, as general counsel and vice-president of Independence and assignee for the benefit of creditors of Twilight Acres, Inc., were both in a position of trust in dealing with the money of its reinsurer, Republic. Both were in a position where the decision to pay would benefit them to the detriment of Republic. We think that under the circumstances both law and equity would forbid Independence, acting by and through its president and general counsel, from making a decision inimical to the interest of Republic. Weatherholt v. National Liberty Ins. Co., 204 Ky. 824, 265 S.W. 311 (1924); Commercial Union Assur. Co., Ltd. v. Winstead, 213 S.W. 955 (Tex.Civ.App., Beaumont 1919); Judd v. Lubbock Mutual Aid Ass'n, 269 S.W. 284 (Tex.Civ.App., Amarillo 1925); Rockford Life Ins. Co. v. Tschiedel, 61 S.W.2d 536 (Tex.Civ.App., San Antonio 1933, writ ref'd); Appleman, Insurance Law and Practice, Vol. 13, § 7686, p. 445; 83 A.L.R. 1509–1536, and authorities therein cited.

It is extremely significant to observe that at the time Hudson and Humphrey participated in the meeting of the executive committee and Humphrey's recommendation to pay the claim was voted approval by the directors present, Republic had both orally and in writing notified Hudson and Humphrey that it was Republic's opinion that

the claim should not be paid and requested that it not be paid without further negotiations with Republic. The action on the part of both Hudson and Humphrey, together with the directors present at the executive committee meeting, in allowing the claim, and the action on the part of Hudson in immediately issuing the check in payment and delivering same the next day to Humphrey, as assignee for the benefit of creditors for Twilight Acres, Inc., all negate the idea of good faith. As stated by our Supreme Court in International Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567 (1963): "The responsibility of the corporate fiduciary includes the dedication of his uncorrupted business judgment for the sole benefit of the corporation." See also Texas Auto Co. et al. v. Arbetter et al., 1 S.W.2d 334 (Tex.Civ.App., San Antonio 1928, writ dism'd); Milam v. Cooper Company, 258 S.W.2d 953 (Tex.Civ. App., Waco 1953, writ ref'd n. r. e.); and 14 Tex.Jur.2d, § 307, p. 406.

■ There is an additional reason in law to affirm the trial court's action in directing the verdict for Republic. The motion for instructed verdict filed by Republic contained fourteen grounds upon which the motion was based. The trial court, in its judgment, does not state the ground or grounds on which the motion is granted. On appeal Independence only assigns as error certain of the grounds advanced in support of the motion but does not attack all of the grounds. Under such circumstances it is held that the judgment of the court may be affirmed because it may rest on grounds not assigned as error by appellant, such grounds being waived. In Olivier v. Life and Casualty Ins. Co. of Tennessee, 440 S.W.2d 398 (Tex. Civ.App., Beaumont 1969), the court states the rule:

"However, in the motion for peremptory instruction filed below, there were other and additional grounds set forth. The trial court granted the motion without specification of the ground, or grounds, upon which the action was taken. The failure to assign error as to all of the grounds upon which the court's action might have been based amounts to a waiver thereof."

See also City of Deer Park v. State et al., 275 S.W.2d 77 (Tex.Sup.1954).

For the reasons assigned appellant's points 1 through 9, inclusive, are overruled.

Our action in affirming the action of the trial court in granting the peremptory instruction in favor of appellee Republic necessarily overrules appellant's point 10 complaining of the action of the trial court in not instructing a verdict in its favor. Such rulings render it unnecessary that we pass upon or consider appellant's point 11 concerning the admissibility of certain testimony. In any event, we have considered such point and find the same to be without merit and overrule same.

Finding no reversible error reflected in this record the judgment of the trial court is affirmed.