## In re GENERAL HOMES CORPORATION.

### The UNSECURED CREDITORS COMMITTEE, Appellant,

v.

### GENERAL HOMES CORPORATION, Appellee.

### Civil Action No. H–91–1250.

United States District Court, S.D. Texas.

June 5, 1996.

Leon V. Komkov, Austin, Texas, for Plaintiff.

John F. Higgins, IV, Houston, Texas, for Defendant.

Opinion on Appeal

HUGHES, District Judge.

### 1. *Introduction.*

Three creditors filed an involuntary petition against a debtor under Chapter 11 of the Bankruptcy Code. During the gap, after the creditors had filed their petition but before the court had ordered relief, the directors of the debtor substantially increased salary and severance benefits for the three principal officers. Two of the three directors were among the officers. Fifty-nine days after approving the new employment contracts, the debtor asked for court approval. More than four months later, the bankruptcy court approved the revised employment contracts over the creditors' objections. The creditors dispute the court's approval of the contracts.

### 2. *Background.*

On July 10, 1990, S.N. Phelps & Co., Howard Leppla, and Eleanora Crosby filed an involuntary bankruptcy petition for reorganization against General Homes Corporation (General). The court entered an order for relief on August 14. During the gap between these two events, James Olafson, William LeSage, and Terry Hartzell, who were the directors of General, resolved without a meeting to enter new employment agreements with James Olafson, William LeSage, and James Alexander, who were the senior officers. The new employment contracts were titled "August 1 Employment Agreements." The new contracts increased the officers' salaries by amounts ranging from one-fifth to over one-third. Additionally, the contracts significantly increased the officers' severance benefits regardless of the reason for termination. The board approved the new agreements on August 1. The pay raises took effect immediately. On September 28, General moved the bankruptcy court to approve the August 1 agreements. The unsecured creditors committee and the bank group objected. Through the board, General then negotiated with the bank group, its largest creditor, and resubmitted the contracts to the court as the "Restated Employment Agreements," having modified the terms slightly. As part of the negotiations, the bank group agreed to subordinate its

claims, up to $2 million, to employee-related expenses. The board approved the restated agreements on December 7. After a hearing, the court approved the restated agreements on December 20.

### 3. *Before Court Approval.*

#### A. *Executory Contracts.*

 Contracts that do not exist at the time the petition is filed cannot be executory contracts. An executory contract is one "on which performance remains due to some extent on both sides." *Tonry v. Hebert (In re Tonry),* 724 F.2d 467, 468 (5th Cir.1984). *See also* S.Rep. No. 989, 95th Cong., 2nd Sess. 58, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5844. An executory contract is "a contract under which the obligations of both the bankrupt and the other party to the contract are so unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." V. Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L.Rev. 439, 460 (1973); *Jenson v. Continental Financial Corp.,* 591 F.2d 477, 481 (8th Cir.1979). The date the bankruptcy petition is filed—not the date the motion for assumption is filed—determines whether a contract is executory. *In re Fryar,* 99 B.R. 747, 748–49 (Bankr.W.D.Tex.1989). Thus, the contract must exist before the petition is filed. Neither the August 1 agreements nor the December 20 agreements predate the petition. Rather, the directors proposed both sets of contracts in response to the petition. They improved the officers' financial positions in the face of reorganization. 11 U.S.C. § 365 (1996); *In re Tonry,* 724 F.2d at 468; 2 Collier on Bankruptcy § 365.02 (Lawrence P. King ed., 15th ed. 1996); John C. Anderson, Chapter 11 Reorganization § 9.13 (1995). *See also In re American Magnesium Co.,* 488 F.2d 147 (5th Cir.1974).

#### B. *Ordinary Course of Business.*

 Employment contracts that substantially increase officers' salaries and severance benefits are extraordinary, falling outside the course of business. Both the August 1 and December 20 agreements increased the salaries of Olafson, LeSage, and Alexander by

amounts ranging from one-fifth to over one-third. Olafson received a 20% raise, LeSage received a 37.5% raise, and Alexander received a 34.5% raise. Similarly, their severance benefits increased drastically, including severance pay for termination *with cause* and an automatic payment at the end of the term. These deals are not ordinary contracts, and officers are not ordinary employees. 11 U.S.C. § 363 (1996).

### C. *Self–Dealing.*

■ The directors' substantially increasing their salaries and severance pay as officers is pure self-dealing. General had three remaining directors and three officers. Olafson and LeSage served as both directors and officers. In light of the pending reorganization, Olafson, LeSage, and Hartzell approved increases in severance and pay for Olafson, LeSage, and Alexander.

Because the new contracts extended the officers' existing employment contracts only two weeks, the debtor did not contract to secure employment of essential people through the reorganization to benefit the corporation. To the contrary, the directors approved these new employment contracts out of self-interest, in complete disregard for the corporation's best interest, and without a board of directors' meeting. Reorganization imposes on the debtor a new set of obligations. These obligations include minimizing operating costs, maximizing the value of the corporate assets, placing the duties to the corporation above self-interest, and abiding by limitations on self-compensation. The directors ignored these obligations. *See In re Herberman,* 122 B.R. 273, 281–82, 285 (Bankr.W.D.Tex.1990).

Further evidence of the self-interest is the surreptitious manner that the contracts were passed. The directors authorized the new contracts without a formal board meeting. Texas law requires that directors both act as a board in setting compensation and pass a formal resolution before the services are rendered. A mere understanding among the directors is insufficient. Because the directors authorized this compensation by casual consent, without a formal meeting, and after part of the services had been rendered, the employment contracts cannot stand even if they were devoid of self-interest. *Dowdle v. Texas Am. Oil Corp.,* 503 S.W.2d 647, 652 (Tex.Civ.App.—El Paso 1973, no writ).

■ Additionally under Texas law, courts weigh the substance of the officers' conduct more heavily than the form of the device used. *Milam v. Cooper Co.,* 258 S.W.2d 953, 956 (Tex.Civ.App.—Waco 1953, writ ref'd n.r.e.). Officers must avoid not only impropriety, but also the appearance of impropriety. As fiduciaries, officers must commit themselves to exercising uncorrupted judgment and serving the best interest of the corporation. *Indep. Ins. Co. v. Republic Nat'l Life Ins. Co.,* 447 S.W.2d 462, 470 (Tex.Civ.App.—Dallas 1969, writ ref'd n.r.e.). Of course, once a petition is filed in bankruptcy, the debtor-in-possession has these obligations to the equity owners and to the creditors.

The argument that the officers needed an incentive to stay with General during this time fails because (1) the new contracts did not substantially extend the officers' employment, (2) General was reorganizing as opposed to liquidating, and (3) General showed no evidence that the incentives were necessary—that, say, the officers had employment offers elsewhere. As directors, Olafson and LeSage acted with self-interest, in disregard for the corporation, and in spite of the pending reorganization when they proposed and approved the new contracts.

### D. *Business Judgment.*

■ Although courts often defer to the business decisions of a board in deciding how a corporation should be run, this "business judgment" rule does not apply when the actions involve self-dealing or agreements outside the ordinary course of business. The business judgment rule "extends only as far as the reasons which justify its existence. Thus, it does not apply in cases . . . in which the corporate decision lacks a business purpose, is tainted by a conflict of interest, is so egregious as to amount to a no-win decision, or results from an obvious and prolonged failure to exercise oversight or supervision." *Resolution Trust Corporation v. Acton,* 844 F.Supp. 307, 314 (N.D.Tex.1994). Moreover, while the business judgment rule may apply to the decisions of solvent corporations, it has

no consequence in the context of a conservatorship. *Askanase v. Fatjo,* No. H–91–3140, 1993 WL 208440, at *5 (S.D.Tex. April 22, 1993). "[T]he standard to be applied should be whether a fully informed, wholly disinterested, reasonably courageous director would dissent from the board's act in any material part. The subjective good faith of the participants is irrelevant; it is rational and objective fidelity by which they shall be judged." *Southdown, Inc. v. Moore McCormack Resources, Inc.,* 686 F.Supp. 595, 602 (S.D.Tex. 1988). Because the directors were interested in the decision and acted outside the ordinary course of business, they do not have the protection of the business judgment rule.

### E. *Best Interest.*

Aside from these defects, the board's approval of the new employment contracts disregarded the best interest of the corporation. The old employment contracts with Olafson and LeSage already secured their employment through July 19. The corporation did not benefit from the new contracts, extending their employment only another two weeks— through July 31. Remember, General was negotiating a reorganization plan and not a liquidation. In preparing an adequate reorganization plan, the directors could legitimately secure their future employment. While restructuring the corporation, it is very important for the directors to keep operating costs as low as possible in an effort to reduce the burdens on the corporation. Ignoring this responsibility, the directors looted the corporate assets during the critical time of reorganization. The directors disregarded the best interest of the corporation.

Despite having been in control as General foundered, the directors were left in charge during the reorganization. Under the guidance of these directors, General's debt grew from $19 million at the end of 1987 to $155 million at the end of 1990 while their salaries steadily increased. In 1986 LeSage received $100,000 for his services. By 1989 LeSage's salary had doubled. The post-petition contracts further increased his salary to $275,-000. The directors reduced the aggregate salaries of the other employees by $500,000 a month at the same time they negotiated their substantial raises. These two acts are clearly inconsistent, revealing the directors' true motivation.

In hindsight, the severity of the directors' actions is further illuminated. A few weeks after the December hearing approving the new employment contracts, General filed its proposed plan of reorganization. According to the plan, the bondholders were to receive zero. The General insiders received their substantial pay raises and severance benefits while over $190 million in bond indebtedness remained wholly uncompensated. In approving new employment contracts for the benefit of three officers, the board of directors ignored the best interest of the corporation and the need for uncorrupted business judgment during the reorganization.

### 4. *Court Approval.*

◼ The court's conclusion that the new employment contracts served the best interest of the corporation is clearly erroneous. The bankruptcy court reasoned that it was in the corporation's best interest for the officers to guide the corporation through the reorganization process. While this may be true, there was no evidence to suggest that these lucrative new contracts were necessary to ensure that the officers would stay. The evidence about the compensation solvent corporations pay their directors has no relevance. If General were not insolvent then maybe the officers' performances would warrant parallel compensation, but General was insolvent.

The court also examined evidence that General's largest creditor, the bank group, agreed to subordinate its claims, up to a maximum of $2 million, for the benefit of the new employment contracts, thus sheltering other creditors from loss associated with the new contracts. A creditor's securing inappropriate, self-defeating transactions does not constitute harmless error, validating the transactions. The bank group offered its guarantee after General submitted the August 1 agreements to the court for approval at which time the bank group objected. The bank group then negotiated with the directors, yielding the December 20 agreements and the bank group's guarantee. The new employment agreements were tainted with self-dealing from their inception, a con-

dition that the bank group's guarantee could not overcome. The bankruptcy court's approval of the new contracts overlooked these improprieties and is clearly erroneous. *Cf., In re Barclay Indus., Inc.,* 736 F.2d 75, 80 (3rd Cir.1984).

*5. Conclusion.*

The excess payments made to the officers before court approval are to be returned to the estate as the board of directors lacked authority to act without court approval. Additionally, the court erroneously approved the new employment agreements. The evidence reveals the directors' self-dealing and their disregard for their duties as fiduciaries and for the pending reorganization. For payments after the December 20 court approval, the agreement of July 20, 1989, governs compensation for Olafson and LeSage through September 1991. Excess payments made to Olafson and LeSage after December 20, 1990, are to be returned to the estate. Because Alexander did not have a formal employment agreement with General before August 1, 1990, the most recent of the letter agreements stating his employment conditions for the earlier four years will apply through September 1991.