In re PERFORMANCE NUTRITION, INC., Debtor.

Jeffrey H. Mims, Trustee, Plaintiff,

v.

Kennedy Capital Management, Inc., Anthony Roth, David Wynne, and Naturade, Inc., Defendants.

Bankruptcy No. 97–30566–HCA–7. Adversary No. 397–3452.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

March 10, 1999.

W. Mike Baggett, William L. Wallander, John P. Kincade, Phillip Lamberson, Winstead Sechrest & Minick P.C., Dallas, TX, for trustee.

Charles A. Gall, Lawrence Chek, Jenkens & Gilchrist, P.C., Dallas, TX, for Naturade, Inc.

Fredrick E. Roth, Richard T. LiPuma, Roth/LiPuma Law Firm, P.C., for Anthony Roth.

## *JUDGMENT*

HAROLD C. ABRAMSON, Bankruptcy Judge.

Came before the Court for trial, the Second Amended Complaint, filed by Jeffrey H. Mims ("Mims"), Trustee, on December 29, 1997, and further defined by the Joint PreTrial Order filed on July 20, 1998.

Pursuant to the Findings of Fact and Conclusions of Law signed by the Court on March 10, 1999, the Court awards judgment in favor of the Trustee as follows:

1. The amount of $1,774,000 actual damages against, Anthony Roth and Naturade, Inc., jointly and severally;

2. The amount of $1,000,000 exemplary damages against Anthony Roth; and

3. The amount of $1,000,000 exemplary damages against Naturade, Inc.

The Court awards prejudgment interest on the actual damage award from December 22, 1996 to the date of this Judgment at 5% per annum. The Court awards postjudgment interest on the actual and exemplary damages at 4.918% until collected.

## *FINDINGS OF FACTS AND CONCLUSIONS OF LAW*

Came before the Court for trial, the Second Amended Complaint ("Complaint"), filed by Jeffrey H. Mims ("Mims"), Trustee, on December 29, 1997, and further defined by the Joint PreTrial Order filed on July 20, 1998. Trial on this proceeding was held over nonconsecutive days from July 27, 1998 to October 30, 1998. Defendant Anthony G. Roth ("Roth") filed Claim Nos. 99 and 100. Defendant Naturade, Inc. ("Naturade") filed Claim Nos. 3 and 64 in the underlying bankruptcy proceeding. This proceeding, which involves claims by the Trustee against Roth and Naturade for breach of fiduciary duties, conspiracy to breach fiduciary duties, aiding and abetting breaches of fiduciary duties, tortious interference with contract, unjust enrichment, and exemplary damages, is in the posture of a counterclaim to those claims; and this proceeding is therefore, a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(C). The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 151, and Miscellaneous Rule No. 33 of the District Court for the Northern District of Texas, which is the standing order of reference in this district. Venue for this proceeding is proper in this Court under 28 U.S.C. §§ 1408 and 1409. The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052:

### *Findings of Fact*

1. The Debtor, Performance Nutrition, Inc. ("Debtor" or "PNI"), was in the business of developing, marketing, and selling nutritional supplements in powder, capsule, and tablet form. The supplement line included products styled "Plex" and "KidsPlex Jr." and other products including "Performance Gain" and "Performance GH". The debtor had spent large sums of money in marketing and promoting the products, using the approach of infomercials on television touting the products.

On September 30, 1995, PNI had achieved annual sales of approximately 3.4 million dollars. During the spring of 1996 PNI had accomplished selling its Plex products to General Nutrition Centers, Inc. ("GNC"), the largest nutriceutical, nutritional, and health supplement retailer in the United States.

2. In late August of 1996, a major stockholder of PNI, Kennedy Capital Management, Inc. ("KCM"), organized an election of the board of directors in order to put in new management and oust the existing management headed by Mr. Gary Lewellyn. There had been problems under Mr. Lewellyn's management, resulting in several lawsuits and/or investigation by the SEC. The result of the new election was the installation of Roth, a former PNI consultant, as the CEO of PNI. Roth was also a member of the Board of Directors of PNI.

3. Roth began acting as PNI's CEO, President, and Board Chairman on August 29, 1996. Roth had received a handsome compensation package from PNI, including a salary of $150,000 per year, a $12,500 signing bonus, stock warrants, and other corporate benefits. In a written employment contract, effective September 1, 1996, Roth agreed to devote his best efforts and substantially all of his business time and attention to the business of PNI, and agreed not to compete with PNI for a period of two years after his departure, if any. When Roth took his office, PNI had between $700,000 and $900,000 in cash or equivalents (including a $500,000 Certificate of Deposit).

4. Immediately upon taking control of PNI, it was quite apparent to Roth that PNI was in distress and had a multitude of problems, including litigation and regulatory problems. The infomercial campaign was not effective, and the business volume was decreasing. It was quite clear that PNI was consuming its cash on matters other than its survival in the business world and was in need of reorganization.

5. At the time Roth took his position as CEO, Naturade was functioning as PNI's primary vendor and "blender." As a blender, Naturade mixed the nutrients in the products sold by PNI. Naturade, acting through its Executive Vice President and General Counsel, Mr. Michael Fernicola ("Fernicola"), who was acting under the authority and knowledge of Mr. Schulman, the president of Naturade, was quite concerned as to the operations of PNI and the assets of PNI, because of the entry of PNI products into the realm of purchases by General Nutrition (GNC). Naturade was interested in acquiring PNI's asset because: (a) PNI had a very valuable relationship with GNC; (b) PNI's brand names, which PNI had spent a lot of money promoting, had considerable value; and (c) PNI's relationship with and sales to GNC would help Naturade, by acquiring such, to close a languishing deal with an entity know as Health Holdings, a company seeking to distribute its Chinese herbal products in the United States, that was interested in investing in Naturade.

6. PNI had begun to sell to GNC through the efforts of a Mr. Scott Dmitrenko ("Dmitrenko"), PNI's employee and sales contact with GNC. The GNC purchases were substantial before Roth became CEO of PNI, and it appeared that those purchases by GNC would increase steadily.

7. During the fall of 1996, Roth and Fernicola were discussing, and did in fact negotiate, an agreement which provided that Roth would cause PNI to transfer the PNI business with GNC, as well as others, to Naturade. The agreement also provided that Roth would be employed by Naturade as an officer of a division of Naturade known as Performance Nutrition, and that Roth would bring with him Dmitrenko and David Wynne, another person who worked for PNI. This arrangement would enable Naturade to capture the business contacts of PNI, as well as the assets consisting of trademarks, trade names, and customer entrée. Roth and Fernicola discussed and

agreed upon a compensation package for Roth when he joined Naturade and delivered the products, trade names, et cetera of PNI. The package would include salary, commissions on the sale of PNI products, and warrants to acquire stock at beneficial prices.

8. In the October/November 1996 time frame, Fernicola called a Dr. L.S. Smith ("Dr.Smith"), a long-time "business consultant" to Naturade, who testified in this Court that he had extensive experience in the bankruptcy process. He testified that he had participated in many reorganizations in different roles, and that he had acquired assets from Chapter 11 entities in about 100 cases. Dr. Smith's testimony was generally not credible as to his dealings with Roth and in his testimony in this Court.

9. Fernicola asked Dr. Smith to contact Roth and work out a transaction between PNI and Naturade as Naturade's consultant and agent. Dr. Smith met Roth at the PNI offices in early December of 1996; he explained to Roth the concept of the filing of a Chapter 11 proceeding with an immediate motion to sell PNI's assets pursuant to § 363 of the Bankruptcy Code. Roth was not familiar with this type situation, but Dr. Smith, on the other hand, had been involved, as he claimed, in many such transactions. Dr. Smith put into play the notion of Roth being hired by Naturade with a package as described above in Roth's conversations with Fernicola. This package was the inducement to Roth to perform the deal with Naturade as outlined by Dr. Smith.

10. On or around December 10, 1996, Roth called one of PNI's attorneys in Las Vegas, Karl Nielson, and told him that "there was a movement afoot" for Naturade to acquire PNI and make significant profits, and that the "information had to be kept quiet." After Roth's telephone call, Nielson wrote a memorandum to his supervising attorney and lead PNI counsel, Kirk Lenhard, repeating his conversation with Roth. Between December 1996 and January 1997, Lenhard had many separate conversations with Roth. From these conversations, which included discussions of PNI's planned bankruptcy, Lenhard gained the clear impression that Roth was going to be employed with Naturade following PNI's bankruptcy.

11. Roth and Dr. Smith made the deal by December 10, 1996, and on Sunday, December 22, 1996, Smith sent a personal and confidential letter (the "December 22 letter") to Roth which stated that after "extensive discussions" with Schulman and Fernicola, Dr. Smith would recommend to Naturade's board a transaction whereby: (a) PNI would file Chapter 11; (b) Naturade would offer to acquire all of PNI's assets pursuant to § 363 of the Bankruptcy Code in exchange for 675,000 shares of newly issued restricted Naturade common stock; (c) Naturade would form a new corporate entity to serve as a repository of the assets; and (d) "Naturade would negotiate with certain officers at PNI to serve as operating management of the newly-formed entity, including compensation arrangements, performance participation, and roles in the overall management of Naturade, as well as the formulation of equity incentives." Dr. Smith intended the December 22 letter to contain the material terms of the purchase of PNI's assets by Naturade.

12. Neither Roth nor Naturade ever disclosed the December 22 letter to PNI's shareholders, Board of Directors, creditors, or this Court, nor was the material term regarding employment disclosed.

13. A letter was drafted by Roth for signature by Fernicola on behalf of Naturade, which set forth the agreements between Naturade and Roth as to his executive compensation package for the position of President of NaturePlex, Inc., a new wholly-owned subsidiary of Naturade. Roth's testimony denying the preparation of this letter for Fernicola's signature was not credible. Roth is one of the least credible witnesses in this case. The Court

finds that Roth prepared the letter setting forth the compensation package for signature by Fernicola. This finding is substantiated by Roth's handwritten notes, showing his composing styles, which are in evidence, and also the discussion between Roth and Mr. Wilk. Roth's notes also show that he was negotiating compensation packages for "David and Scott" ("David Wynne and Scott Dmitrenko"). It was vital that Roth bring Dmitrenko with him because Dmitrenko had the contact at GNC.

14. At the time Roth came into his position at PNI, there was sufficient cash to file a Chapter 11 Proceeding and to attempt to sell the assets or to revitalize the business of PNI by an investor. Instead, Roth utilized the cash to pay attorney fees and to settle lawsuits, all of which were meaningless to the ultimate survival or sale of PNI. Roth never made any efforts to sell PNI's (its products, trademarks, or customer list, et cetera) to any entity other than Naturade. Roth's testimony to the contrary is not credible. Roth had the deal for himself and Dmitrenko at Naturade, and it was the deal he wanted to make in violation of his obligations to the shareholders and creditors of PNI.

15. Without any attempt to get a valuation of the assets of PNI, Roth settled upon a deal with Naturade, under the direction of Dr. Smith, for a non-cash offer of 675,000 shares of restricted Naturade stock for PNI's assets. Roth accepted Dr. Smith's valuation of the stock; Roth accepted whatever directions Dr. Smith gave him without any attempt to protect the interest of the stockholders or creditors of PNI.

16. Roth recommended Naturade's unreasonably low, non-cash offer of 675,000 shares of restricted stock to PNI's Board of Directors, and later to the Court, because of his conflict of interest involving his employment with Naturade. He aloigned his interests with Naturade, contrary to his duty to his employer.

17. Before PNI filed for bankruptcy on January 21, 1997, Roth signed a Letter of Intent to sell PNI's assets to Naturade. The Letter of Intent signed by PNI and Naturade made no mention of the material terms of the transaction that Naturade would negotiate with certain officers of PNI for employment, nor did it disclose negotiations of employment between Roth and Naturade. The Letter of Intent further failed to mention that Naturade's offer was for restricted stock.

18. Throughout his tenure as CEO of PNI, Roth forecasted strong sales, which would have been attractive to potential buyers of PNI's assets in the booming health and nutritional supplement and nutriceutical industry. During Roth's tenure as CEO of PNI, the U.S. market for health and nutritional supplements grew at approximately 7% per year and reached a total of $5 to $6 billion in sales in 1997. Based on an income approach of projecting discounted future cash flows, PNI's assets were worth at least $2,049,000, and perhaps as much as $7,000,000 to a strategic buyer in the relevant industry market.

19. When Roth began negotiating for himself with Naturade and/or when he reached an agreement with Naturade regarding himself, Roth should have stepped aside, due to the conflict of interest he faced, and allowed another of PNI's directors to evaluate the Naturade purchase deal and attempt to market the assets to others. Roth and Naturade clearly should have advised the Court of the employment negotiations and agreement involving Roth. The facts were withheld from the Court.

20. In late November or early December 1996, when Roth began discussing the option of selling PNI's assets to a third-party buyer under the protections of the Bankruptcy Court, Roth should have made deliberate, exhaustive efforts to find potential bidders and/or buyers other than Naturade. Despite warnings from PNI's lawyers that he should do so, Roth did not

attempt any bidding effort. The Court finds that Roth's failure to act in this respect was caused by his self-interest in employment with Naturade—a conflict of interest—and the influence of Naturade in the process of wrecking PNI.

21. According to Scott Dmitrenko, now a Naturade employee, before it purchased the PNI assets, Naturade had no products with strong retail draw, or "sizzle" as Dmitrenko termed it. Now, all of Naturade's products are being sold to GNC, and the PNI product line is available at 3,000 GNC outlets.

22. No minutes from any Board meeting, which might mention or reference Board discussions or resolutions regarding Roth's conflict or the sale of PNI's assets to Naturade, were presented in this case. The consent action signed by five out of six directors, lacks any reference to Roth's conflict of interest. The Court accepts as fact the testimony of Tom Pauken ("Pauken"), a former PNI director who resigned from the Board due to his suspicions of self-dealing by Roth. Pauken testified that he was not presented with any of the documents exchanged between Naturade and Roth, that implicated Roth's potential employment with Naturade. Specifically, Pauken testified forcefully that Roth did not disclose the December 22 letter to the PNI board. He also testified that Roth never disclosed any potential employment with Naturade. This inaction of Roth shows a clear conflict of interest between Roth and his duties to the stockholders, the Board, and the creditors of PNI.

23. A Mr. Dean Oakey testified as an outside director at PNI. Mr. Oakey had read a transcript of Roth's testimony, having received a copy of the transcript from Naturade's attorney before he testified. This event happened despite the Court's invocation of the rule, whereby a witness is not to be present during testimony. Oakey testified that he reviewed the December 22 letter at a Board meeting when he first met PNI's St. Louis attorney. Tom Newmark and Peter Kerth were PNI's St. Louis attorneys. However, the only board meeting attended by Tom Newmark was on December 18, 1996, four days before Dr. Smith's December 22 letter was drafted, and Peter Kerth admittedly did not attend any board meetings. Mr. Oakey's testimony was not credible.

24. Roth testified that he offered to the Board to step aside from negotiating with Naturade so as to as to permit another director to handle the negotiations. Pauken specifically denied that Roth made such an offer. Pauken's testimony is credible on this matter, and Roth's testimony is not credible. Roth hid his conflict of interest and his activities with Naturade and Fernicola from the Board of PNI and, therefore, he knowingly and intentionally breached his duties as a fiduciary.

25. On January 21, 1997, PNI filed for bankruptcy with only $26,400 in cash remaining. This amount of cash was wholly inadequate to operate PNI's business, and virtually assured PNI's liquidation.

26. Also, on January 21, 1997, Roth sent a letter to GNC offering blending services, marketing Naturade's other products and services to GNC. Similarly, on January 24 and February 7, 1997, while PNI was in a bankruptcy proceeding and about finished, Roth wrote letters to Internutria, another nutriceutical company, offering Naturade's blending services. These letters indicate that Roth had "left his post as PNI's CEO." Instead of promoting Naturade, Roth should have been trying to bring in other bidders for PNI.

27. On January 28, 1997, PNI filed a § 363 "Emergency" Motion to sell essentially all of its assets to Naturade (the " § 363 Emergency Sale Motion"). Dr. Smith was the architect of PNI's strategy in using the § 363 Emergency Sale Motion. Similar to the Letter of Intent, the § 363 Emergency Sale Motion failed to disclose that Naturade's offer was to be funded with restricted stock.

28. At the time PNI filed its § 363 Emergency Sale Motion, there was no al-

ternative to terminating the operations of PNI and selling off the assets at liquidation if the proposed sale to Naturade was not approved. This was Dr. Smith's strategy and Roth was to carry it out.

29. Dr. Smith submitted legal and factual language for use by PNI's attorney in the § 363 Emergency Sale Motion and related documents. Portions of Dr. Smith's language were integrated into the sale documents. Dr. Smith also critiqued PNI's bankruptcy attorney's legal work. Included in the materials Dr. Smith sent to PNI's lawyers is a memorandum dated February 14, 1997, which evidences that employment discussions had taken place between Roth and Naturade. Roth testified to the contrary at the sale hearing four days later. This testimony was not true.

30. Regarding the § 363 Emergency Sale Motion, PNI attorney Glenn A. Portman ("Portman") advised Roth in a conversation among Roth, Dr. Smith, and Portman that there was a 95% chance that (a) the Bankruptcy Court would deny the § 363 Emergency Sale Motion as proposed; and (b) that the Bankruptcy Court would convert the case to a case under Chapter 7. Dr. Smith responded that approval or denial of the § 363 Emergency Sale Motion was not of concern to Naturade, and that Naturade's offer would not include a plan. He said that presenting the sale as an emergency motion was a condition precedent to Naturade's willingness to make an offer for PNI's assets.

31. Similarly, PNI attorney Peter ("Kerth") Kerth knew that it was likely that the § 363 Emergency Sale Motion would be denied. In fact, Kerth's notes reflect that, if it were presented to this Court, the § 363 Emergency Sale Motion would be "denied as a matter of course."

32. Kerth's notes also state, "won't do the deal unless Tony [Roth] moves to L.A." Kerth testified that these notes were made during a conversation with Roth, and the statement reflects either what Naturade told Roth or Roth's impression of Naturade's intent.

33. Naturade, principally through Fernicola, Dr. Smith, and Schulman, enticed Roth's breaches of his fiduciary duties by offering Roth salary, commissions on the sale of PNI products through GNC (the very thing PNI had to sell), stock options, and a management role. The failure of their strategy resulted in the failure of the § 363 Emergency Sale Motion and a foreseeable forced liquidation of PNI's assets at a price much lower than the value PNI could have received had Roth not breached his duties, aided and abetted by Naturade.

34. On the same day that PNI filed its § 363 Emergency Sale Motion, PNI filed its Schedules and Statements of Financial Affairs, signed by Roth under penalty of perjury; Roth permitted the Statements of Financial Affairs to be filed with material nondisclosures, including: (a) failing to list $325,000 in payments to Naturade that were made within ninety days of bankruptcy; (b) failing to identify a $100,000 cash payment on December 10, 1996, to settle a lawsuit; (c) failing to list payments to Roth's wife's travel agency; (d) failing to list payments to Roth's brother's law firm; (e) failing to list payments for Roth's personal moving expenses; and (f) failing to list payments for health club fees and dues.

35. Doug Hubert ("Hubert"), PNI's comptroller, who prepared the Statements of Financial Affairs, informed Roth that the Statements of Financial Affairs may be inaccurate. Hubert also asked Roth to ensure that Kerth reviewed the Statements of Financial Affairs before filing. Hubert had worked at PNI for less than three weeks before it filed bankruptcy, and he had no bankruptcy experience. Yet, he knew there were potential problems with PNI's bankruptcy disclosures.

36. The undisclosed employment discussion and negotiations between Roth and Naturade continued into PNI's Chapter 11 proceeding. On or about February 3, 1997, Roth sent a document entitled "Executive

Summary" to Naturade which stated that "Performance Nutrition will operate as a wholly-owned subsidiary of Naturade ... and ... Anthony G. Roth will serve as president." The Executive Summary also demonstrated that Roth would work out of Naturade's offices in Paramount, California. Roth's relocation to Los Angeles, as anticipated in the Executive Summary, is consistent with Kerth's notes ("won't do the deal unless Tony moves to L.A."), with Roth's notes, and with the Fernicola Letter, which provides for moving expenses.

37.  Roth sent the Executive Summary to Naturade at Naturade's request. Naturade never sent a letter or other response indicating that the Executive Summary was inaccurate or otherwise disavowing the Executive Summary.

38.  The Executive Summary was never disclosed to the Court, PNI's Board of Directors, PNI's attorneys, or the creditors and shareholders of PNI. Indeed, when shown the Executive Summary, Peter Kerth, one of PNI's bankruptcy attorneys, testified that it was contrary to the advice he had given Roth regarding employment negotiations with Naturade and contrary to what Roth had told him about the status of such negotiations.

39.  In addition to the § 363 Emergency Sale Motion, PNI filed an Emergency Motion to Factor.  Because Roth had squandered PNI's cash, PNI was unable to fill a $325,000 order from GNC. The draft of the Emergency Motion to Factor was prepared with Roth's relationship with Naturade in mind.  Roth contacted Naturade regarding factoring the GNC receivable from this sale.  After PNI filed bankruptcy, however, Naturade raised the prices it charged PNI for its products by twenty-five to thirty-five percent.

40.  On February 18, 1996, the Bankruptcy Court heard and denied the Emergency Motion to Factor PNI's GNC invoices to Naturade.  Roth testified at the hearing that he had not been talking to Naturade regarding his employment, and

that he had no offer of employment from Naturade.  This assertion was not true.

41.  On February 19, 1997, the Bankruptcy Court heard the § 363 Emergency Sale Motion.  At that hearing, Fernicola testified to the Court that he had not had conversations with PNI employees, officers, or directors regarding employment in connection with the transaction.  He further testified there were no finder's fees or stock to be given to anyone for bringing the deal.  Dr. Smith testified at the February 19th hearing that he referred all conversations regarding employment to Fernicola and Schulman, but that there was no requirement in any portion of the deal that anyone be extended an offer of employment by Naturade, that no one on behalf of PNI had tried to solicit a commitment for employment by any person from Naturade, and that there were no terms of the transaction presently standing that are not incorporated in the Letter of Intent.  This testimony was not credible.

42.  When asked specifically what conversations he had with respect to employment, Dr. Smith testified "... that wasn't his area of involvement."  Dr. Smith did not disclose his December 22 letter which outlines what Roth could expect if the transaction went through, or his memorandum of only five days before to Mr. Kerth where he said employment discussions should be not be disclosed.

43.  Neither Roth, nor Fernicola, nor Smith disclosed to the Court Paragraph 4 of the December 22 letter, the Executive Summary, any of the other documents, or any of the negotiations and/or agreements reached between Roth and Naturade. Similarly, neither Roth, nor Fernicola, nor Dr. Smith informed the Court that Naturade would not do the deal unless Roth moved to Los Angeles.  The tangible, written evidence as well as Wilk's testimony is contrary to Roth's testimony at the February 18th hearing and Fernicola's and Dr. Smith's testimony at the February 19th hearing.

44. The Court denied the § 363 Emergency Sale Motion on February 19, 1997, and ordered the appointment of a Chapter 11 Trustee, Jeffrey Mims.

45. At the time of Mims' appointment, PNI had approximately $40,000 in available cash, no employees, and no operations. As predicted by Roth, a liquidation sale of PNI's assets was Mims' only option.

46. When Mims inspected PNI's offices, he was unable to locate a reading file for Roth or any file with documents about the Naturade sale. The December 22 letter and the Executive Summary were not located in PNI's files.

47. On April 15, 1997, Rosen Systems, Inc. conducted a Chapter 7 auction of the Debtor's assets, excluding real property. Dr. Smith, through his DLS Financial Services, Inc., purchased PNI's trademarks, trade names, formulas, product lines, and customer lists for $275,000. Dr. Smith was acting as Naturade's agent and on its behalf. Within twenty minutes after the Chapter 7 auction was completed, Fernicola hired Scott Dmitrenko, former PNI employee, director, and GNC contact, to work for Naturade. Within the hour, Schulman and Fernicola met Roth at a nearby restaurant to hire him to run Naturade's new division.

48. Business consultant J. Stone testified that it was unusual for a distressed company of PNI's size to have $700,000 in cash available to it at the time new management took over. Based on potential liabilities stemming from, among other things, litigation, consumer complaints, regulatory issues, and Lewellyn's alleged past deeds, Stone opined that PNI should have sought bankruptcy protection between October 15 and November 15, 1996. During that period of time, PNI still had approximately $400,000 in cash available to it. The Court accepts the opinion of Mr. Stone.

49. At that point in time, PNI's KidsPlex, Jr. product had been accepted and sold nationally by GNC, and PNI's other products were sold by GNC as well. This arrangement would be beneficial in a Chapter 11 case to attract potential buyers or investors.

50. Roth was intentionally not attentive in identifying possible purchasers of the PNI product line, trademarks, et cetera. A CEO not acting under a conflict of interest of the kind Roth had—Roth served three masters: Naturade, himself, and PNI—would seek out other alternatives for the benefit of his employer, its stockholders, and creditors.

51. The purpose of an attempted sale is to generate interest in the value-producing assets of a company and potentially create a bidding war. This process is not a costly exercise and can be handled by management internally or through the hiring of a consultant. Consultants who could develop the type of offering and process necessary to market PNI's assets are available in the $15,000 to $25,000 range. These same types of consultants are also available to work on a contingency basis.

52. Roth did not show either of the PNI attorneys, Mr. Portman or Mr. Kerth, the December 22 letter from Dr. Smith, which outlined the terms of the transaction to be handled in the Bankruptcy Court. It was material that the terms of the letter be made known to the Court. Neither did Roth make known to Portman the contents of the December 22 letter. Smith dictated the transaction and the way it was to be handled to Portman.

53. With regard to damages, each of the witnesses questioned on the subject agreed that a business is worth today what it can generate in the future in cash to its owners or investors. Future cash flows can be estimated by reasonable assumptions.

54. In a Valuation Report prepared by Mr. Hatamyar (the "Hatamyar Report"), PNI's former financial consultant, the value of PNI's product line, customer list, and trademark was $1.7 million as of May 1997, which was after the bankruptcy sale. It

was difficult to ascertain exactly the income under Roth's management for September, October, and November of 1996; however, that income was estimated by Hatamyar at $1,090,000 adjusted for litigation, infomercials, and other extraordinary items.

55. The Trustee's financial valuation expert, Jim Travis, estimated the fair market value of PNI's income-producing, core business, product line assets to be $2,049,000 as of December 10, 1996. The product line assets included working capital, machinery, equipment, and intangible assets associated with PNI's operations. Travis' valuation did not include real property owned by PNI.

56. Travis presented a "going concern" valuation. Under his analysis, Travis assumed that PNI's core business assets would continue to be operated as opposed to being liquidated. Had Roth pursued this course of action, the loss would have been avoided.

57. Travis' projected revenues closely paralleled and complimented the projected revenues for PNI's first year of operation under Naturade in the Hatamyar Report. Hatamyar accepted PNI's actual Revenue of September, October, and November 1996 and assumed those revenues to be historical for PNI's first year of operation as a Division of Naturade. In short, the Hatamyar Report showed 1997 revenues at $3.5 million; Travis projected 1997 operating revenues at $3.6 million. The basis for Travis' revenue projections were Hatamyar's Valuation, the Roth Action Plan, and the general run rate of revenues for the business as of December 10, 1996.

58. Travis' and Hatamyar's revenue projections were conservative. Indeed, both sets of revenue projections trailed Roth's projected revenues of $5 million, identified in his Action Plan, and his forecast of projected sales of $6.1 million for PNI as a division of Naturade as of February 14, 1997.

59. With respect to an expense structure, Travis viewed PNI's core business assets as being acquired by a strategic buyer. Travis, however, valued PNI from the standpoint of a financial buyer based on a discounted cash flow income approach. On the revenue side and with respect to the cost of goods sold, Travis analyzed the company strictly on a financial analysis basis.

60. Because it was a financial and not a strategic valuation, Travis' valuation reflected only a part of PNI's GNC relationship and business. The full benefit of the GNC relationship was not included in Travis' income approach valuation. A strategic buyer looking for a market entry into GNC would likely pay a premium over the value of $2,049,000 that Travis estimated.

61. Travis increased the discount rate he used by 25 percent—from 16 to 20 percent—premised on the possibility of not achieving the projected cash flows. The Court accepts Mr. Travis' valuation.

62. Roth offered no damages expert.

63. Naturade offered an expert, Scott Hakala, in rebuttal to Travis' valuation of $2,049,000.

64. Starting with Travis' valuation of $2,049,000, Hakala first discounted that value by $500,000 for what Hakala termed as necessary "working capital." Such a deduction is not supported. First, a prospective buyer of PNI's business line assets could borrow, if necessary, funds to be used for working capital purposes or would have such funds on hand. Second, a buyer of PNI's assets could have operated the company with a low level of working capital.

65. Next, Hakala deducted another $500,000 from Travis' valuation for "capital expenditures." PNI's business operation, however, was not capital intensive. Because PNI did not blend its own product, it did not require a capital outlay for manufacturing or blending equipment. Similarly, any typical leased premises would support its marketing efforts. Neither

Naturade nor Roth introduced any evidence at trial to support a need for PNI to have or acquire substantial property, plant equipment, or other capital.

66. After deducting that $1 million (the $500,000 for working capital and the $500,000 for capital expenditures) from Travis' estimated value of $2,049,000, Hakala then discounted the remaining estimated value of $1,049,000 by 75 percent for PNI's "distressed state." This reduction is similarly not supported by the evidence. The highest value of PNI's operating assets would be realized by separating those assets from the distressed nature of the corporation itself through Chapter 11.

67. Hakala did not prepare a valuation of PNI's product line assets. Hakala opined that as of December 1996 or January 1997 "any offer" would be a fair offer for PNI's product line assets. Hakala also likened PNI's product line assets to a "wildcat oil well." The evidence does not support Hakala's opinion.

68. The evidence also supported a finding that PNI's assets would have interested potential strategic buyers. A strategic buyer would look beyond projected cash flows associated with PNI's product line assets and further consider elements such as brand name, customer base, and distribution channels. A strategic assessment would look at the operating assets, whether there are trademarks associated with the assets, distribution channels, and other items that might be of value to someone other than the company that already holds these items. This was Mr. Palo's assessment.

69. A "build or buy" analysis looks to what replacement costs would be. In PNI's case, approximately $7 million was spent from 1991 through 1996 on advertising and infomercials that built up a level of brand equity. To replicate that brand equity would require similar expenditures and marketing.

70. Based on the attributes offered by PNI's product line, PNI's strategic expert, Joe Palo, estimated that a strategic buyer would be willing to pay $3 to $5 million for PNI's core business, absent its liabilities. In a Chapter 11 proceeding the liabilities could be reorganized as less cost.

71. A potential buyer is willing to pay more for business assets that are in operation than for business assets that are sold after the business has been closed down, even though the assets are essentially the same in each circumstance. The asset sale process yields higher value from a business and assets in operation than from a business and assets in liquidation.

72. Neither Naturade nor Roth offered any expert witness to rebut Palo's assessments and opinions regarding a potential strategic buyer of PNI's assets.

73. GNC's October 1998 issue of *Let's Live* prominently featured an advertisement for Naturade's new KidsPlex, Jr. candy bars. The advertisement reflected the joint marketing effort between Naturade and GNC with the KidsPlex name most prominently featured. The advertisement reflected that the products were "available nationwide at GNC."

74. Naturade's and Roth's wrongful acts caused the Debtor and its creditors to lose the ability and opportunity to realize the maximum value of PNI's trademarks, trade names, product line, and other intangible assets. Naturade and Roth jointly and severally caused injury to PNI's estate.

75. PNI's estate would have realized between $2,000,000 and $7,000,000 for its trademarks, trade names, product lines, and other intangible assets in a sale to a third-party buyer other than Naturade

    a. had Roth not delayed until PNI was in a hopeless position;

    b. had Roth not breached his fiduciary duties, and had he filed Chapter 11 for PNI;

    c. had Naturade not aided and abetted and participated with Roth in his breach of his fiduciary duties;

d. had Naturade and Roth not conspired to breach Roth's fiduciary duties;

e. had Naturade not interfered with Roth's contract with PNI to devote his best efforts to PNI's business; and/or

f. had Roth and Naturade not sought to unjustly enrich themselves at the expense of the PNI bankruptcy estate.

76. Obtaining a strong retail product and distribution system was important to Naturade. In addition to providing an outlet for its own products, Naturade was attempting to close a deal with an entity called Health Holdings, which was interested in obtaining a retail distribution pipeline in the United States for Chinese herbal products. Schulman testified that getting the PNI assets helped with Naturade's marketing capabilities related to the Health Holdings deal and also strengthened Naturade financially. Although Naturade and Health Holdings representatives had been talking for one and a half years, Health Holdings did not obtain funding and close its deal with Naturade until a few months after Naturade acquired PNI's assets.

77. Dr. Smith negotiated the Health Holdings matter on Naturade's behalf and was authorized to close the deal by Naturade's Board. Also, before the closing, a Health Holdings representative met with Roth, who provided him with projections relating to sales of PNI's former products.

78. Naturade currently markets the Health Holdings Chinese herbal products under the name the "Chinese Way." Although Schulman testified that the Chinese Way products were not available at GNC, Naturade's own advertisement in GNC's magazine demonstrated that the Chinese Way products were available at GNC. Clearly, the access to GNC and other retail outlets that PNI and its product line provided were instrumental to Naturade in closing the Health Holdings deal. Schulman's testimony was not credible.

79. For their part, Naturade's insiders had a substantial pecuniary interest in closing the Health Holdings deal. Schulman, Dr. Smith, and Barry Zwick, a Naturade director, cashed out a substantial part of their Naturade stock in the Health Holdings transaction. In the aggregate, they received more than $2.5 million from Health Holdings for their Naturade stock. Additionally, Health Holdings infused $6 million into Naturade. This substantial capital infusion, made possible only after Naturade acquired PNI's assets, is further indication of the value of PNI's product line assets in general and to Naturade in particular.

80. In summary, what transpired in this case was a situation where a young man who becomes the CEO, President, and Director of PNI saw the opportunity to enrich himself by inducing Naturade to hire him along with his associate, Dmitrenko, on very nice salary packages, along with commissions on sales and stock warrants, if and when he delivered the assets and GNC contacts of PNI to Naturade. The most important of the assets were the trademarks, the trade names, and the contact with GNC. Roth is a very self-assured young man, with a big smile, who saw the opportunity to get himself a deal with Naturade. That's the long and the short of this case. He breached his fiduciary duties to his board, stockholders, and creditors; and he squandered money of the corporation by paying attorneys and settlements instead of trying to save the company through a Chapter 11 proceeding. Naturade, acting through Schulman—and earlier through Fernicola, who is now deceased—was quite willing to go along with Roth under the direction of Dr. Smith in order to achieve the entrée into GNC. This action would increase the sales volume of Naturade and induce the investors, Health Holdings, to either invest in or purchase Naturade. As a result of the acquisition of the PNI products and the entrée into GNC, Naturade stock began to rise and

**110**

Schulman and his other stock holders were able to make quite a sum of money upon the entry of Health Holdings into Naturade. Roth, as of the time of the trial, along with Dmitrenko, were still employed by Naturade and making their salaries, commissions, and sitting with stock warrants to acquire stock at beneficial prices. The whole picture worked very nicely, except that the Trustee now seeks redress for the creditors and stockholders of PNI, as well as deterrence of such activity by persons in the future.

### Conclusions of Law

### Breaches of Fiduciary Duties

*Duty of Loyalty*

1. Officers and directors owe a duty of loyalty to their corporation to. act only in the corporation's and its shareholders' best interest. *Fagan v. La Gloria Oil and Gas Co.*, 494 S.W.2d 624, 628 (Tex.Civ. App.—Houston [14th Dist.] 1973, no writ). The duty of loyalty holds officers and directors to an "extreme measure of candor, unselfishness and good faith," particularly where there is an interested transaction. *International Bankers Life Insurance Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963). Whether an officer or director is "interested" is a question of fact. *Id.* Interested transactions include those in which officers or directors derive personal profit as well as those which deprive the corporation of an opportunity to profit. *Assurance Systems Corp. v. Jackson (In re Jackson)*, 141 B.R. 909, 916 (Bankr. N.D.Tex.1992). A transaction between a fiduciary's corporation and another corporation in which the fiduciary has a significant financial interest is also an interested transaction. *Id.* In such a situation, an officer or director must not allow his personal interests to prevail over the interests of the corporations. *Gearhart Industries, Inc. v. Smith International, Inc.*, 741 F.2d 707, 719–20 (5th Cir.1984). Here, Roth put his own personal interests ahead of the Debtor's when selling PNI's assets to Naturade.

2. A transaction in which a corporate fiduciary derives personal profit is subject to close examination. *International Bankers Life Insurance Co.*, 368 S.W.2d at 577. Although an officer or director is not strictly forbidden from profiting from a corporate transaction, the interests of the officer or director must be secondary to the best interests of the corporation. *In re Jackson*, 141 B.R. at 916. A fiduciary is, however, in all instances forbidden from making any secret profit from a corporate transaction. · *International Bankers Life Insurance Co.*, 368 S.W.2d at 577. Even where a corporate transaction in which an officer or director is interested turns out to be profitable for the corporation, the form of the transaction will give way to the substance of what has actually occurred. *Id.* The burden is on the officer or director to show that the transaction was fair to the corporation. *In re Jackson*, 141 B.R. at 916. Finally, directors and officers of a corporation must make full disclosure of their personal interest in a transaction that they are negotiating for the corporation. *General Dynamics v. Torres*, 915 S.W.2d 45, 49 (Tex. App.—El Paso 1995, writ den'd).

3. Roth breached the duty of loyalty he owed to PNI when he dealt secretly with Naturade and when he failed to disclose such dealings to PNI's board of directors. Roth was interested in the transaction with Naturade because he had a financial interest in Naturade, which was the promise of a position with Naturade's management, salary, stock, and commissions on sales of PNI's products to GNC. Roth's failure to appropriately market PNI's assets in connection with the proposed § 363 sale was caused by a conflict of interest resulting from his personal negotiations and dealings with Naturade. Such failures by Roth damaged the Estate and constitute a breach of the duty of loyalty.

*Duty of Care*

4. Officers and directors owe their corporations a duty of care. *Fagan,*

494 S.W.2d at 628. These fiduciaries owe the corporation a duty to act only in the best interest of the corporation. *In re Jackson,* 141 B.R. at 915. Such due care is described as "that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances." *Id.* An officer or director is liable for any loss that the corporation may suffer as a result of negligent mismanagement. *Id.*

■ 5. Roth's failure to diligently market PNI's assets constitutes a breach of his duty of care to PNI. Had Roth properly marketed PNI's assets, he would have realized a greater return for such assets than was realized in the sale to Dr. Smith through DLS Financial Services, which was little more than a conduit for Naturade. Furthermore, Roth's misappropriation of corporate funds, the use of such for personal expenses and other unnecessary expenses, is also a breach of his duty of care. A careful director would not take corporate funds for his personal use. Finally, Roth's squandering of corporate assets on the payment of attorneys fees and settlement claims, instead of using such monies to revive the floundering corporation, perhaps through a Chapter 11 proceedings, constitutes a breach of his duty of care. A careful director in a similar situation would make diligent efforts to revive the company. Such breach damaged the Estate.

■ 6. Roth may not use the business judgment rule as a defense to his choices with regard to the sale of PNI's assets to Naturade, nor to any other of his beaches of the duty of care and the duty of loyalty due to his conflict of interest. *Resolution Trust Corp. v. Acton,* 844 F.Supp. 307, 315 (N.D.Tex.1994). The business judgment rule provides a presumption that the officers and directors of a corporation, in making a business decision for that corporation, act only after they have been appropriately informed and after they have honestly determined that the action to be taken is in the best interest of the corporation. *Southdown, Inc. v. Moore McCormack Resources, Inc.,* 686 F.Supp. 595, 600 (S.D.Tex.1988). "Under the 'business judgment' rule, alleged unwise, inexpedient, negligent or imprudent decisions or conduct will not sustain a suit against the management of a corporation...." *Cleaver v. Cleaver,* 935 S.W.2d 491, 495 (Tex.App.—Tyler 1996, writ den'd). Furthermore, the business judgment rule may be wholly inapplicable in a case where the corporation is insolvent. *Unsecured Creditors Committee v. General Homes Corp. (In re General Homes Corp.),* 199 B.R. 148, 151–52 (S.D.Tex.1996).

7. Because Roth acted with self-interest, he may not enjoy the protection of the business judgment rule. Roth could not have believed that his actions were in the best interest of PNI, all the while denying the existence of, and intentionally covering up, his negotiations with Naturade. Also, with regard of the sale of PNI's assets, Roth was not acting in the best interest of PNI when he did not obtain a valuation of PNI's assets, when he failed to shop PNI's assets in the open the market in order to locate possible willing buyers other than Naturade, and when he failed to set up a procedure whereby competing bids for PNI's assets could be offered and considered. The business judgment rule is inapplicable in this case.

*Chapter 11   Fiduciary Duties*

■ 8. The officers and directors of a debtor in possession owe the same fiduciary duties as a trustee in bankruptcy. *National Convenience Stores, Inc. v. Shields (In re Schepps Food Stores, Inc.),* 160 B.R. 792, 797–98 (Bankr.S.D.Tex. 1993); 11 U.S.C. § 1107(a). A trustee in bankruptcy owes a duty of care and a duty of loyalty to the corporation and its shareholders, similar to a director's fiduciary duties, but also owes those same duties to the creditors of the bankrupt corporation. *In re Schepps Food Stores, Inc.,* 160 B.R. at 797–98. Furthermore, in the context of a proposed sale under 11 U.S.C. § 363, a

debtor in possession must articulate a sound business justification in order to satisfy the fiduciary duties it owes to the debtor, the creditors, and the equity holders. *Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir.1986). Finally, officers of a debtor in possession are considered to be officers of the court, who, therefore, owe a duty not to perpetrate a fraud upon the Court. *Gumport v. China International Trust and Investment Corp. (In re Intermagnetics America, Inc.)*, 926 F.2d 912, 917 (9th Cir.1991) ("Officers of a debtor-in-possession are officers of the court because of their responsibility to act in the best interests of the estate as a whole and the accompanying fiduciary duties."); *see also, Tri–Cran, Inc. v. Fallon (In re Tri–Cran, Inc.)*, 98 B.R. 609, 617 (Bankr.Mass.1989) (noting that the debtor in possession is an officer of the court, by virtue of its responsibility to act in the best interest of the estate and, therefore, must not perpetrate a fraud on the court); *see further, In re Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 524–525 (Bankr.E.D.N.Y.1989) (the debtor in possession is a new juridical entity, which is "an officer of the court subject to the supervision and control of the Bankruptcy Court and the provisions of the Bankruptcy Code"). As officers of the court, officers of a debtor in possession owe the Court a duty to act in the best interest of the estate. *In re Intermagnetics America, Inc.*, 926 F.2d at 917; *In re Tri–Cran, Inc.*, 98 B.R. at 617.

9. Roth breached his debtor in possession fiduciary duties by failing to appropriately market PNI's business. Roth also failed to disclose his personal interest in the sale of PNI's assets to Naturade and failed to set up a bidding procedure for the 11 U.S.C. § 363 sale of PNI's assets. Any business justification Roth might provide for the proposed sale cannot be a sound business justification in light of his breaches of the duty of care and the duty of loyalty. Finally, Roth breached his duties as an officer of the court. Roth lied to the Court when he indicated at the February 14, 1997 hearing that he had not engaged in employment negotiations with Naturade. Roth further breached his duty as an officer of the court to act in the best interest of the estate when he failed to properly market PNI's assets and when he acted in his own interest and the interest of Naturade in attempting the § 363 sale of PNI's assets to Naturade.

*Naturade's Aiding and Abetting Roth in Breaching His Fiduciary Duties*

10. Parties who knowingly join a fiduciary in breaching his fiduciary duties are jointly and severally liable with that fiduciary. *Jackson v. Smith*, 254 U.S. 586, 589, 41 S.Ct. 200–01, 65 L.Ed. 418 (1921); *see also, Kinzbach Tool Co., Inc. v. Corbett–Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 514 (1942) (holding that third parties who knowingly aid a tortfeasor in the breach of his fiduciary duties are jointly and severally liable with the tortfeasor for such breach). Naturade was aware of all the fiduciary duties owed by Roth as an officer and director of PNI, as a corporation, and as an officer and director of PNI, as the debtor in possession. Naturade was also aware of Roth's duty to this Court not to perpetrate a fraud on the court. Naturade aided and abetted Roth in breaching such duties by entering into negotiations and with Roth, which included selling PNI's assets to Naturade and employing Roth as part of Naturade's management. Naturade assisted and encouraged Roth in concealing their deal. Furthermore, by dangling the carrots of employment, salary, stock, and commissions on sales of PNI products to GNC, as well as a role in Naturade's management, Naturade enticed Roth to forego marketing PNI's assets to willing buyers other than Naturade. Such aiding of Roth in the breach of his fiduciary duties damaged the Estate. Naturade is jointly and sever-

ally liable with Roth for the damage resulting from such breaches.

*Fairness*

11. "An interested officer seeking to enforce a transaction ... has the burden of proving the utmost fairness and good faith of the transaction." *General Dynamics,* 915 S.W.2d at 49. Such transaction will be closely scrutinized by the Court. *Id.* Factors to be considered in determining the fairness and good faith of an interested transaction include "the adequacy of consideration, the degree to which the officer represented the corporation, the disclosure to and knowledge of the full board of directors or shareholders, and the necessity of the transaction to the corporation." *Id.* Here, the adequacy of the consideration is questionable given the Trustee's expert's valuation of PNI's product line assets at more than $2 million with the strategic value being between $3 to $7 million, while the offer tendered by Smith on behalf of Naturade was worth between $600,000 and $700,000. At best, Naturade presented testimony that its offer was worth $1.5 million, which is still below the Trustee's expert's valuation. It is undisputed that Roth represented the corporation in the transaction. Roth did not disclose to the rest of PNI's board of directors or to its shareholders his interest in selling PNI's assets to Naturade, nor did he disclose his employment negotiations with Naturade. Roth has not carried the burden of demonstrating the fairness of Naturade's offer.

### Civil Conspiracy

12. Roth and Naturade engaged in civil conspiracy in Roth's breach of his fiduciary duties. Civil conspiracy involves a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 719–20 (Tex. 1995). *See also, Elliott v. Tilton,* 89 F.3d 260, 264 (5th Cir.1996). The elements of a civil conspiracy are (a) two or more persons, (b) an object to be accomplished, (c) a meeting of the minds on the object or course of action, (d) one or more overt unlawful acts, and (e) damages proximately resulting from those acts. *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex. 1983). Because the essence of a conspiracy is the secret intent of the conspirators, a plaintiff usually must prove the agreement element of civil conspiracy by circumstantial evidence and by reasonable inference. *Garcia v. Jordan, Inc.,* 881 S.W.2d 155, 158 (Tex.App.—El Paso 1994, no writ). Once a civil conspiracy is found, each coconspirator is responsible for any action in furtherance of the conspiracy performed by other conspirators. In other words, each action in a civil conspiracy is imputed to each coconspirator regardless of who actually performed the acts. *Akin v. Dahl,* 661 S.W.2d 917, 921–22 (Tex. 1983), *cert. den'd* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984), *rehearing den'd* 467 U.S. 1231, 104 S.Ct. 2691, 81 L.Ed.2d 885 (1984).

13. Naturade conspired with Roth to breach his fiduciary duties. The seemingly lawful act of the purchase and sale of PNI's assets through a § 363 sale was a knowing attempt to accomplish an unlawful purpose through unlawful means, including Roth's failure to disclose employment negotiations between himself and Naturade, and including Roth and Naturade's knowing attempt to conceal such dealings. These actions were breaches of Roth's fiduciary duties, of which Naturade was aware and in the commission of which Naturade conspired with and aided and abetted Roth. Such actions damaged the estate in the amount of the difference between the value paid for the assets at the Chapter 7 auction, about $275,000, and the amount the Estate would have realized if the assets had been properly marketed by Roth, absent the influence of Naturade, while PNI was in operation. As conspirators, Roth and Naturade are jointly and

severally liable for these damages resulting from civil conspiracy.

### Tortious Interference

14. Naturade tortiously interfered with the employment contract between PNI and Roth. The elements of tortious interference are (a) that a contract subject to interference exists; (b) that the alleged interference was willful and intentional; (c) that the willful and intentional act proximately caused damage; and (d) that actual damage or loss occurred. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997). Both the party who breaches the contract and the party who interferes with the contract are jointly and severally liable for the actual damages incurred. *Armendariz v. Mora,* 553 S.W.2d 400, 406 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.). Exemplary damages are available where there is proof of actual malice, which is defined as "ill-will, spite, evil motive, or purposing the injury of another." *Id.* at 407.

15. When Naturade initiated employment negotiations with Roth, Naturade intentionally and willfully interfered with the employment contract between Roth and PNI. In Roth's employment contract with PNI, he promised to use his "best efforts" on behalf of PNI, but failed to do so by placing his own interests equal to or above the interests of PNI in connection with Naturade, breaching his fiduciary duties to PNI. Thus, Roth breached his contract with PNI. Roth's self-interested behavior was directly caused by Naturade's employment negotiations with him, and by Naturade's offer and deal with Roth to sell PNI's assets to Naturade, which deal benefitted Roth. The interference was malicious in that it purposed to injure another, PNI and later the bankruptcy estate of PNI, for the reason that Naturade knew or consciously disregarded the fact that its efforts to obtain PNI's assets, and the manner in which it pursued those efforts, would cause damage to PNI and the estate of PNI. Roth and Naturade

are, therefore, jointly and severally liable for the damages flowing from Naturade's tortious interference with Roth's employment contract and for Roth's breach thereof.

### Unjust Enrichment

16. Naturade and Roth were unjustly enriched by the sale and purchase of PNI's assets. "A person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle that whatsoever ... a man ought to do, the law supposes him to have promised to do." *Ferrous Products Co., Inc. v. Gulf States Trading Co., Inc.,* 160 Tex. 399, 332 S.W.2d 310, 312 (1960). Roth was unjustly enriched at the expense of the Estate and PNI because he drew a high salary and bonus from PNI for about six months and caused PNI to pay his own personal expenses as well as other unnecessary expenses. Roth then failed to abide by his fiduciary duty as an officer and director of PNI, a debtor in possession, to maximize the value of PNI's assets in order that he could begin working for Naturade. Naturade was unjustly enriched at the expense of the bankruptcy estate of PNI for the reason that Naturade now owns PNI's product line assets, having purchased them from its own consultant/insider, Dr. Smith, who had purchased the assets cheaply as a result of Naturade's interference with Roth's sale and marketing of the assets.

### Damages

17. Damages for breach of fiduciary duty include a company's lost marketability, but have also been described as "any loss." In *Meyers v. Moody,* corporate losses resulting from the breach of fiduciary duty were said to be measurable "in terms of loss of value or physical damage to corporate assets, restraints upon the marketability of corporate assets, and interference with the development of corporate properties." *Meyers v. Moody,* 475 F.Supp. 232, 237 (N.D.Tex.1979). In the appeal of that same case, the 5th Circuit

drew a much broader description of such damages saying that "any loss," including consequential damages, is recoverable in an action for breach of fiduciary duty. *Meyers v. Moody*, 693 F.2d 1196, 1214 (5th Cir.1982), *cert. den'd* 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983).

18. The usual measure of damages for tortious interference is the same as for breach of contract: an attempt to put the plaintiff in the same economic position he would have been in had the contract not been breached. *Armendariz*, 553 S.W.2d at 406. Damages for tortious interference are not limited to contract damages, however, and may also include consequential losses and, if they are reasonably to be expected to result from the interference, damages for emotion distress or actual harm to reputation. *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 660 (Tex. App.—Corpus Christi 1991, writ den'd). Other measures of damages available for tortious interference include unjust enrichment and lost profits. *Sandare Chemical Co., Inc. v. WAKO International, Inc.*, 820 S.W.2d 21, 23 (Tex.App.—Fort Worth 1991, no writ) (showing that unjust enrichment is an appropriate measure of damages in cases of tortious interference); *Cain v. Fontana*, 423 S.W.2d 134, 137 (Tex.Civ.App.—San Antonio 1967, writ ref'd n.r.e.) (showing that the recovery of lost profits is appropriate in a case of tortious interference).

19. Where unjust enrichment is found, damages are measured according to the rules governing restitution. *Burlington Northern Railroad Co. v. Southwestern Electric Power Co.*, 925 S.W.2d 92, 97 (Tex.App.—Texarkana 1996, writ granted), *aff'd by* 966 S.W.2d 467 (Tex. 1998). "When a defendant has been unjustly enriched by the receipt of benefits in a manner not governed by contract, the law implies a contractual obligation upon the defendant to restore the benefits to the plaintiff." *Id.*

20. "Damages [for civil conspiracy] are not presumed from the existence of a conspiracy because the gist of a civil conspiracy is the damage resulting from [the] commission of a wrong which injures another, not the conspiracy itself." *Hart v. Moore*, 952 S.W.2d 90, 98 (Tex.App.—Texarkana 1997, writ den'd) *citing Schlumberger Well Surveying Corp. v. Nortex Oil and Gas Corp.*, 435 S.W.2d 854, 856 (Tex.1968.). Therefore, a civil conspiracy is not a cause of action within itself, but a basis for imposing exemplary damages predicated upon the existence of actual damages. *Id.*

21. The Trustee has shown his right on behalf of the bankruptcy estate of PNI to recover from Roth and Naturade, jointly and severally, the difference between the value paid for the assets at the Chapter 7 auction, approximately $275,000, and the amount the estate would have realized for the asset had such assets been properly marketed by Roth, while PNI was operating, without Naturade's interference. The Court finds the going-concern value of PNI's income-producing, core business, product lines assets as of December 1996 to be $2,049,000, which is the estimated valuation provided to this Court by the Trustee's valuation expert, Jim Travis. This Court awards to the Trustee on behalf of the bankruptcy estate of PNI actual damages of $1,774,000, which is the going-concern valuation of $2,049,000 less the $275,000 realized at the Chapter 7 auction.

*Exemplary Damages*

22. In Texas, courts of equity may award exemplary damages. *International Bankers Life Insurance Co.*, 368 S.W.2d at 582–84. Exemplary damages are available for tortious interference and civil conspiracy. *Armendariz*, 553 S.W.2d at 407 (exemplary damages available for tortious interference); *Akin*, 661 S.W.2d at 921–22 (exemplary damages available for civil conspiracy). In both cases, a showing of malice or wanton behavior is required in

order to warrant an award of exemplary damages. *Armendariz*, 553 S.W.2d at 407 (actual malice is "ill-will, spite, evil motive, or purposing the injury of another"); *Akin*, 661 S.W.2d at 922 (when the conspiracy is to perform an unlawful tort that does not contain the element of malice or wanton behavior, there must be an additional finding that each co-conspirator acted with malice in order to support an award of exemplary damages). A showing of conscious indifference for the rights of other has also been shown to support an award of exemplary damages. *Fortner v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 687 S.W.2d 8, 12 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). The Texas statute governing the award of exemplary damages requires fraud, malice, or in the case of a wrongful death action, wanton acts or omissions or gross negligence. TEX.CIV. PRAC.REM.CODE § 41.003(a) (Vernon 1998). Under the statute, the plaintiff must prove the elements of exemplary damages by clear and convincing evidence. *Id.* at § 41.003(b). The Texas statute also requires that, in an action where there is more than one defendant, an award for exemplary damages must be specific to each defendant. *Id.* at § 41.006. Finally, exemplary damages must be reasonably proportionate to the actual damages, but there is not set rule or ratio between the amount of actual damages and the exemplary damages; rather, such determination depends upon the fact of each particular case. *Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981).

23. Malice has been defined in case law as "ill-will, spite, evil motive, or purposing the injury of another." *Armendariz*, 553 S.W.2d at 407. However, the Texas statute governing exemplary damages provides a much more extensive definition of malice. Under the Texas statute, malice is defined as "a specific intent by the defendant to cause substantial injury to the claimant; *or ... an act or omission ... which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and ... of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.*" TEX.CIV.PRAC.REM.CODE § 41.001 (Vernon 1998) (emphasis added).

24. Roth behaved with malice in conspiring with Naturade to sell PNI's assets to Naturade, and in not properly marketing PNI's assets. Naturade also behaved with similar malice in its willful interference with PNI's employment contract with Roth and in conspiring with Roth to purchase PNI's assets, which Naturade knew would substantially damage the estate. Both Roth and Naturade behaved in such a way that their actions, when viewed objectively from the standpoint of Roth and Naturade at the time of the tortious interference and at the time of their acts of civil conspiracy, involved "an extreme degree of risk, considering the probability and magnitude of the potential harm to" PNI, its stockholders, its creditors, and the bankruptcy estate of PNI. *Id.* Roth and Naturade had "actual, subjective awareness of the risk involved, but nevertheless [proceeded] with conscious indifference to the rights" of PNI, its shareholders, its creditors, and the bankruptcy estate of PNI. *Id.* The Trustee has shown by clear and convincing evidence such awareness and disregard on the parts of both Roth and Naturade. *Id.* at § 41.003(c). Therefore, exemplary damages are awarded to the Trustee in the amounts of $1,000,000 against Roth, individually, and $1,000,000 against Naturade, individually, for an aggregate amount of $2,000,000.

25. Prejudgment interest on the actual damages will be awarded to the Trustee from December 22, 1996 to the date of the Judgment at 5% per annum. Postjudgment interest on the actual and exemplary damages will be awarded at 4.918% until collected.

*Allocation of Settlement*

26. The parties claiming credit for a settlement have the burden to show that the damages assessed against it have already been covered by such settlement. *McFarland v. Leyh (In re Texas Petroleum Corp.)*, 52 F.3d 1330, 1340 (5th Cir.1995). When the nonsettling defendants were not parties to the settlement negotiations, as is the case here, the nonsettling defendants need show only that the plaintiff has previously settled with a different party the claim on which the nonsettling defendants are liable. *Id.* The burden then shifts to the plaintiff to show that the settlement does not provide him with double recovery. *Id.* If the plaintiff carries his burden, the burden then shifts back to the defendants to show the applicability of the settlement. *Id.*

27. The Trustee must show that his settlement with Kennedy Capital Management and David Wynne does not provide him with a double recovery in this case. The settlement with Kennedy Capital Management and David Wynne is directed toward the change in control action, and not the matters upon which the Trustee proceeded to trial with these two defendants. Once the Trustee has shown that the settlement should not be allocated to the damage award against Roth and Naturade, the burden shifts to Roth and Naturade to show that they should be given credit for the settlement. Defendants did not offer such proof, and announced that they "closed" at the end of testimony, therefore, they may not claim credit for the settlement with Kennedy Capital Management and David Wynne.

28. Any Conclusion of Law more properly deemed to be a Finding of Fact is hereby incorporated in this Court's Findings of Fact. Any Finding of Fact more properly deemed to be a Conclusion of Law is hereby incorporated in this Court's Conclusions of Law.

A separate Order will be entered consistent with this decision.